A● 106 (Rev. 04/10) Application for a Search Warrant (Modified: WAWD 10-26-18)

# UNITED STATES DISTRICT COURT

for the

Western District of Washington

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>Information associated with Facebook, Hotmail, and<br>Comcast Accounts, more fully described in<br>Attachments A-1, A-2, and A-3 | )<br>)<br>)  Case No.   MJ23-442<br>)<br>)<br>) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
See Attachments A-1, A-2, and A-3, which are attached hereto and incorporated herein by this reference.

located in the _____Northern_____ District of _____California and elsewhere_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachments B-1, B-2, and B-3, which are attached hereto and incorporated herein by this reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1341, 1343, 1344, 1028A, 1956, 1957, 371, and 1349 | Mail, Wire, and Bank Fraud; Aggravated Identity Theft; Money Laundering; and Conspiracy |

The application is based on these facts:

✓ See Affidavit of FBI Special Agent Matthew McCormick, continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Pursuant to Fed. R. Crim. P. 4.1, this warrant is presented: ☑ by reliable electronic means; or: ☐ telephonically recorded.

*Applicant's signature*

Matthew McCormick, Special Agent, FBI

*Printed name and title*

○ The foregoing affidavit was sworn to before me and signed in my presence, or
◉ The above-named agent provided a sworn statement attesting to the truth of the foregoing affidavit by telephone.

Date:   09/06/2023

*Judge's signature*

City and state:  Seattle, Washington

Brian A. Tsuchida, United States Magistrate Judge

*Printed name and title*

USAO# 2021R01338

**AFFIDAVIT**

1
2  STATE OF WASHINGTON        )
                             )     ss
3  COUNTY OF KING             )
4
5        I, Matthew McCormick, having been duly sworn, state as follows:

6                **INTRODUCTION AND AGENT BACKGROUND**

7        1.      I am a Special Agent with the Federal Bureau of Investigation (FBI) and have

8  been since April of 2021. I am currently assigned to the Seattle Field Office. My primary

9  duties include investigating violations of federal law, including corporate fraud, securities

10 fraud, government program fraud, and healthcare fraud. Those duties include investigating

11 instances of wire fraud being used for financial gain at the expense of others. Before my

12 career as an FBI Special Agent, I was employed by a large public accounting firm for over

13 two years and, as part of my employment, I examined financial information.

14       2.      The facts set forth in this Affidavit are based on my own personal knowledge;

15 knowledge obtained from other individuals during my participation in this investigation,

16 including other law enforcement personnel; review of documents and records related to this

17 investigation; communications with others who have personal knowledge of the events and

18 circumstances described herein including, but not limited to, witnesses in this investigation;

19 and information gained through my training and experience. Because this Affidavit is

20 submitted for the limited purpose of establishing probable cause in support of the application

21 for a search warrant, it does not set forth each and every fact that I or others have learned

22 during the course of this investigation.

23       3.      I make this affidavit in support of an application for a search warrant for records

24 and information associated with certain accounts stored at premises controlled by electronic

25 communications services and/or remote computer service providers, referenced below. The

26 information to be searched is described in the following paragraphs and in Attachments A-1,

27 A-2, and A-3, which are incorporated herein. This affidavit is made in support of an

28

Affidavit of SA Matthew McCormick
USAO#2021R01338 – 1

1  application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and

2  2703(c)(1)(A) to require:

3      a.    Meta Platforms, Inc., located at 1601 Willow Road, Menlo Park,

4            California, to disclose to the government copies of the information,

5            including account content and communications, further described in

6            Section I of Attachment B-1, pertaining to the following Facebook

7            account ("**RADCLIFFE's Target Facebook Account**"), identified

8            below and in Attachment A-1:

9                • **Username Rich.radcliffe2**

10               • **Id # 100003086382362**

11               • **www.facebook.com/rich.radcliffe2**

12     b.    Microsoft, Inc., located at 1 Microsoft Way, Redmond, Washington, to

13           disclose to the government copies of the information, including account

14           content and communications, further described in Section I of

15           Attachment B-2, pertaining to the account(s) associated with the

16           following Hotmail account ("**RADCLIFFE's Target Email**"), identified

17           below and in Attachment A-2:

18               • **Rich37r@hotmail.com**

19     c.    Comcast Communications LLC, located at 1800 Bishops Gate Blvd,

20           Mount Laurel, New Jersey, to disclose to the government copies of the

21           information, including account content and communications, further

22           described in Section I of Attachment B-3, pertaining to the account(s)

23           associated with the following Comcast email account ("**WEDEBERG's**

24           **Target Email**"), identified below and in Attachment A-3:

25               • **paul.wedeberg@comcast.net**

26  Collectively, these accounts are referred to in this affidavit as "the **TARGET ACCOUNTS**."

27  Upon receipt of the information described in Section I of Attachments B-1, B-2, and B-3,

28  government-authorized persons will review that information to locate the items described in

Affidavit of SA Matthew McCormick
USAO#2021R01338 – 2

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  Section II of Attachments B-1, B-2, and B-3.

2      4.    This warrant is requested in connection with an ongoing investigation in this

3  District by the FBI's Seattle Field Office. As set forth below, the FBI is investigating Richard

4  RADCLIFFE and Paul WEDEBERG for Mail, Wire, and Bank Fraud, in violation of Title 18,

5  United States Code, Sections 1341, 1343, 1344; Aggravated Identity Theft, in violation of

6  Title 18, United States Code, Section 1028A, Money Laundering, in violation of Title 18,

7  United States Code, Sections 1056 and 1057, and Conspiracy, in violation of Title 18, United

8  States Code, Sections 371 and 1349 (the Subject Offenses). There is probable cause to believe

9  that evidence of the Subject Offenses will be found in the **TARGET ACCOUNTS**.

10 Therefore, there is probable cause to search the information described in Attachments A-1, A-

11 2, and A-3 for evidence, instrumentalities, or fruits of these crimes, as described in

12 Attachments B-1, B-2, and B-3.

## JURISDICTION

14     5.    This Court has jurisdiction to issue the requested warrant because it is "a court

15 of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) &

16 (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that - has

17 jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## SUMMARY OF PROBABLE CAUSE

19 **A.    Overview**

20     6.    The FBI is investigating various fraud schemes perpetrated by suspected co-

21 conspirators Richard RADCLIFFE and Paul WEDEBERG in the Western District of

22 Washington and elsewhere between 2019 and 2021.

23     7.    The FBI's investigation of RADCLIFFE and WEDEBERG began when the FBI

24 received a tip from Talcott Resolution Life and Annuity Insurance Company. Talcott's

25 internal investigation found that RADCLIFFE fraudulently obtained approximately $1.38

26 million from two life insurance annuity accounts owned by Lenore Rozsa (Rozsa). In

27 summary, the policy provided a benefit to an individual named Robert Brown (Brown) if

28 Brown outlived Rozsa. The FBI's investigation, set forth in greater detail below, established

Affidavit of SA Matthew McCormick
USAO#2021R01338 – 3

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

that Brown predeceased Rozsa, and therefore lost the right to claim Rozsa's insurance benefit. But RADCLIFFE impersonated Brown and lied about the timing of Brown's death to claim annuity benefits he was not eligible to receive.

8.     The FBI's investigation also revealed additional information about RADCLIFFE's relationship to Robert Brown. Brown was married to a woman named Sandra Brown (Sandra) for over 50 years. In the later years of their marriage, Brown transitioned from male to female and lived by the name Carolyn.[1] Brown passed away on March 9, 2019. Sandra, then 77 years old and living alone without any next of kin, had survived a stroke a few months earlier and her cognitive abilities were declining.

9.     At the time of Brown's death, RADCLIFFE owned a restaurant in Sammamish, Washington. Sandra lived within walking distance of RADCLIFFE's restaurant. In the months following Brown's death, Sandra began visiting RADCLIFFE's restaurant more frequently and developed a close relationship with RADCLIFFE. Sandra told other people that she and RADCLIFFE were in love and would get married (or even that they were secretly married); RADCLIFFE denied a romantic relationship with Sandra when others inquired. Between July and October 2019, Sandra added RADCLIFFE to her financial accounts. During this same time period, RADCLIFFE and his friend/business partner, Paul WEDEBERG, gained Power of Attorney for Sandra.[2] In October 2019, Sandra revised her will to name RADCLIFFE (along with his daughter Kathryn) the sole beneficiary of Sandra's multi-million-dollar estate. In December 2019, Sandra was formally diagnosed with vascular dementia. By March 2020, WEDEBERG described Sandra as no longer possessing the mental

---

[1] This investigation involves the misuse of the name and identity of "Robert Brown." To maintain consistency and avoid confusion, this affidavit refers to Sandra Brown's spouse as Robert (Carolyn) Brown or Brown. The name "Robert Brown" is used to explain a scheme in which RADCLIFFE falsely identified himself as "Robert Brown" as part of a scheme to defraud. The affidavit refers to Sandra Brown as "Sandra" to distinguish her from her spouse.

[2] Power of Attorney is the authority to act for another person in specified legal, financial, or medical matters and is typically granted to an individual or entity by a formal legal document.

Affidavit of SA Matthew McCormick
USAO#2021R01338 – 4

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1 capacity to manage her own investments. Sandra passed away in November 2020, and

2 RADCLIFFE inherited Sandra's estate.

3       10.    RADCLIFFE and WEDEBERG's relationship with Sandra had concerning

4 aspects, set forth in greater detail below, that suggested she, too, may have been the victim of

5 a scheme to defraud.

6       11.    Furthermore, while investigating RADCLIFFE's scheme to defraud Talcott

7 Insurance and Sandra Brown, the FBI uncovered evidence of other frauds committed by

8 RADCLIFFE and WEDEBERG during the same time period they were acting as Sandra's

9 Power of Attorney. Specifically, during the initial phase of the COVID-19 pandemic in April

10 and May 2020, RADCLIFFE and/or WEDEBERG submitted false information in support of a

11 fraudulent Paycheck Protection Program (PPP) Loan application and a fraudulent Pandemic

12 Unemployment Assistance (PUA) claim.

13       12.    Based on the evidence of multiple schemes to defraud committed by

14 RADCLIFFE and WEDEBERG between 2019 and 2021, the FBI seeks authority to search:

15 (1) RADCLIFFE's Facebook account (**RADCLIFFE's Target Facebook Account**); (2)

16 RADCLIFFE's primary email account (**RADCLIFFE's Target Email**); and (3)

17 WEDEBERG's primary email account (**WEDEBERG's Target Email**) for communications

18 and other evidence pertaining to these schemes.

19 **B.**    **The FBI opens an investigation into RADCLIFFE's fraud and identity theft**

20         **scheme involving Sandra Brown's deceased spouse, Robert Brown.**

21       13.    Lenore Rozsa passed away on or about December 9, 2020. Rozsa owned

22 insurance annuity contracts 712106852 and 712170439 with Talcott, with Robert Brown as

23 the beneficiary. However, unbeknownst to Talcott, Brown predeceased Rozsa by 21 months.

24 Being unaware of Brown's death, Talcott mailed a Death Claim Kit to Brown's last known

25 residential address: 3515 E. Lake Sammamish Shoreline SE, Sammamish, Washington

26 98075, with information about claiming Rozsa's annuities.

27       14.    On or about January 7, 2021, Talcott received a call from Richard

28 RADCLIFFE, using phone number 206-841-0636. Further investigation, including multiple

Affidavit of SA Matthew McCormick
USAO#2021R01338 – 5

1  interviews and a review of RADCLIFFE's banking records, confirmed that this phone

2  number belonged to RADCLIFFE. In the call, RADCLIFFE falsely identified himself as

3  Robert Brown.

4      15.    Talcott's calls with RADCLIFFE were recorded, and I have reviewed the audio

5  recordings of those calls. During this investigation, I have become familiar with

6  RADCLIFFE's voice from sources that include an audio-recorded interview with the King

7  County Sheriff's Office that lasted over an hour. As such, I am able to recognize the voice on

8  the calls as that of RADCLIFFE, even when RADCLIFFE uses the false name of Robert

9  Brown.

10      16.    In the January 7 call, RADCLIFFE (acting as Brown) stated that he had

11  received the Death Claim Kit in the mail and asked the Talcott representative for more

12  information about the annuities and the claim process. The representative instructed

13  RADCLIFFE to complete one of the forms that was mailed to him and return it with a copy of

14  Rozsa's death certificate. RADCLIFFE was unable to provide the date of birth or last four

15  digits of Rozsa's social security number; therefore, the representative was unable to provide

16  contract details on the annuities.

17      17.    On or about January 20, 2021, Talcott received a call from RADCLIFFE, using

18  the same phone number: 206-841-0636. This time, RADCLIFFE identified himself by his

19  true name. However, RADCLIFFE falsely identified himself as the executor of Robert

20  Brown's estate. RADCLIFFE stated that he received the Death Claim Kit from Talcott that

21  listed Robert Brown as the beneficiary. RADCLIFFE stated that he did not have any

22  information on Rozsa and asked for help on how to proceed with collecting money for

23  Brown's estate. RADCLIFFE stated that Brown had passed away before Rozsa.

24      18.    The Talcott representative informed RADCLIFFE that if Brown predeceased

25  Rozsa, the annuities' payout would go to Rozsa's estate. RADCLIFFE asked when Rozsa

26  died and was advised that Rozsa died on December 9, 2020. Radcliffe then lied to the

27  representative and said that Brown died on December 24, 2020. RADCLIFFE was informed

28

Affidavit of SA Matthew McCormick
USAO#2021R01338 – 6

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  that Talcott would need a copy of both Brown's and Rozsa's death certificates to go over

2  details of the annuities' payout amounts.

3      19.    On or about January 25, 2021, Talcott received a call from RADCLIFFE, who

4  called from the same number: 206-841-0636, and identified himself as "Robert Brown."

5  RADCLIFFE was unable to provide personally identifiable information for Rozsa and was

6  denied details about the annuities and the payout amounts.

7      20.    The same day, Talcott received a second call from RADCLIFFE, using the

8  same number, 206-841-0636. In this call, RADCLIFFE falsely identified himself as Brown.

9  RADCLIFFE provided an incorrect date of birth for Rozsa. After being transferred to another

10  representative, RADCLIFFE was able to pass security by providing a past address of Rozsa.

11  The representative provided the balances of the annuities to RADCLIFFE and provided the

12  correct date of birth and last four digits of the social security number for Rozsa.

13      21.    The following day, January 26, 2021, Talcott received another call from

14  RADCLIFFE, calling from the same number: 206-841-0636, and again masquerading as

15  Brown. After answering security questions, RADCLIFFE was provided with the balance of

16  the annuities, and given instructions on what paperwork needed to be submitted to claim the

17  annuities.

18      22.    On or about February 5, 2021, RADCLIFFE mailed two packages to Talcott,

19  located at 1338 Indian Mound Dr, Mount Sterling, Kentucky 40353. The sender information

20  section of the shipping label lists RADCLIFFE's name, his phone number (206-841-0636),

21  and the address of his restaurant: 3310 E Lake Sammamish Pkwy SE Ste F, Sammamish, WA

22  98075. Documents contained within the package included the beneficiary election form that

23  was filled out in Brown's name using Brown's personal identifying information (except the

24  phone number listed for Brown was RADCLIFFE's number: 206-841-0626) and a voided

25  check associated with Boeing Employee Credit Union (BECU) account -6467.[3] The

26

27  _____

[3] BECU account -6467 was Robert Brown and Sandra Brown's joint account. Robert Brown and Sandra Brown were the

28  account holder names listed on the BECU check. RADCLIFFE was added to the account on or around October 15, 2019.

Affidavit of SA Matthew McCormick
USAO#2021R01338 – 7

1    beneficiary election form was signed by "Robert Brown" on February 1, 2021, almost two

2    years after Brown's death on March 9, 2019.

3        23.      Two wires for the annuities were deposited into BECU account -6467 on or

4    around February 2, 2021. One wire deposit was in the amount of $1,168,221.89, and the other

5    was in the amount of $217,961.23. RADCLIFFE subsequently withdrew the funds from the

6    BECU account and appropriated them for his own use.

7        24.      On November 15, 2021, Talcott filed a civil complaint for damages and

8    equitable relief against RADCLIFFE in the United States District Court Western District of

9    Washington, Cause No. 2:21-cv-01546-RSM. RADCLIFFE agreed to repay the stolen

10    insurance benefits with interest, and Talcott received the payment wire on or around

11    December 27, 2021. On January 7, 2022, Talcott filed a stipulated order of dismissal.

12 **C.      RADCLIFFE's relationship with Brown's widow, Sandra.**

13        25.      During the investigation into RADCLIFFE's misuse of Robert Brown's

14    identity, the FBI discovered information suggesting that RADCLIFFE and his friend/business

15    partner, Paul WEDEBERG, engaged in a scheme to defraud Brown's widow, Sandra, a

16    vulnerable elderly woman. The scheme involved assuming responsibility for all of Brown's

17    medical and financial decisions, misappropriating Brown's funds, misrepresenting the nature

18    and goals of the relationship, and isolating Sandra from her support network. As part of this

19    scheme, WEDEBERG became Power of Attorney for Sandra and RADCLIFFE became

20    primary beneficiary of Sandra's approximately $3.8 million estate.

21                              *November 2018 – May 2019*

22        26.      Medical records show that Robert (Carolyn) Brown took Sandra to her

23    physician in or around November of 2018. Brown described Sandra as having issues with

24    dementia to include forgetfulness, getting lost, dizzy spells, and mood swings. Sandra was

25    unable to complete the Montreal Cognitive Assessment (MoCA)[4] and thought the year was

26

27 ───────────────

28 [4] The MoCA Test is a peer-reviewed tool for detection of cognitive impairment that is widely used in clinical settings and academic research.

Affidavit of SA Matthew McCormick
USAO#2021R01338 – 8

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1 | 1942 and Ronald Reagan was president.

2 |      27.    In or around November 2018, Sandra was admitted into the hospital for two

3 | days for a stroke. The Browns decided to leave the hospital because they did not believe they

4 | were receiving adequate communication. Magnetic Resonance Imaging (MRI) showed a

5 | small area of hemorrhage within the left parietal lobe of Sandra's brain.

6 |      28.    In or around January 2019, Sandra's doctor's notes showed that she was

7 | mentally improving but not back to baseline. Robert (Carolyn) Brown was always with

8 | Sandra, took care of the finances, and handled most of the cooking and shopping.

9 |      29.    E.K. moved next door to the Browns in 2013. E.K. stated that she would assist

10 | the Browns whenever they needed help. E.K. drove Sandra to visit Brown at the hospital

11 | before Brown died. During this time, E.K. stated that Sandra would have days that she was

12 | "her normal confused self" and other days she was very confused. E.K. recalled an instance

13 | that when Sandra was in a confused state, and she wandered into a neighbor's house.

14 |      30.    In or around April 2019, medical records show Sandra's doctor stated that she

15 | was having a "profound recovery" after being widowed from her partner of 45+ years.

16 | Sandra's doctor stated that Sandra has lots of support from her nearby community and that

17 | her neighbor R.N. was helping her with her finances.

18 |      31.    R.N., and his wife W.N. had lived next door to the Browns since 2001. Like

19 | E.K., R.N. drove Sandra to the hospital to visit Brown. After Brown passed away in March

20 | 2019, R.N. began helping Sandra with her finances, and W.N. encouraged Sandra to create a

21 | will because Sandra did not have one. Sandra did not want to go through the process at first,

22 | but eventually went to see a lawyer named Jennifer King to set up Last Will and Testament.

23 |      32.    I reviewed the Last Will and Testament that was prepared by Jennifer King.

24 | Sandra listed Michelle Murray (Murray) [legal name: Steven Brockman] as the Executor.

25 | R.N. and W.N. were listed as alternate Executors. Sandra listed Murray as the beneficiary and

26 | the National Rifle Association as secondary beneficiary if Murray is not living. The Last Will

27 | and Testament was signed May 16, 2019.

28 |

Affidavit of SA Matthew McCormick
USAO#2021R01338 – 9

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

33.     Murray met the Browns at a social club and considered Robert (Carolyn) Brown to be her best friend. Murray gave Sandra rides to the hospital to visit Brown before Brown's death. After Brown's death, Murray continued to be friends with Sandra. According to an interview with Marray, Murray would visit Sandra a few times a week to assist with tasks around the house. Murray rebuilt Sandra's kitchen, performed work on the house water system, repaired the dock by the lake, tore down an old storage shed, and took Sandra to the hair salon.

*May 2019 – August 2019*

34.     In the spring and summer of 2019, Sandra's neighbors and friends—E.K., Murray, and W.N.—noticed that Sandra began to frequent a restaurant owned by RADCLIFFE: Kryptonite Bar and Grill in Sammamish, Washington. The restaurant was within walking distance of Sandra's home on Lake Sammamish. E.K. stated that, before Brown's death, Sandra only went to the restaurant a couple of times. Murray stated that she accompanied Sandra to the restaurant on two separate occasions after Brown's death. RADCLIFFE had food and a glass of wine ready for Sandra when she visited the restaurant. Murray did not approve of RADCLIFFE giving Sandra wine since Sandra was not supposed to be drinking alcohol.

35.     A review of Sandra's credit card statement showed that between June 19, 2018, and January 31, 2019, there were no charges on Sandra's credit card for Kryptonite Bar and Grill. Between February 1, 2019, and April 30, 2019, there were less than ten charges for Kryptonite Bar and Grill. Between May 1, 2019, and October 31, 2019, there were 101 charges for Kryptonite Bar and Grill. Of the 101 charges, 84 were made during the three-month period of July 1, 2019, through September 30, 2019.

36.     L.H. worked at Kryptonite Bar and Grill until the summer of 2019. In an interview, L.H. stated that RADCLIFFE made multiple comments to her about wanting a "Sugar Momma," and that it was a life goal to find a woman that would take care of him so that he could retire. RADCLIFFE told L.H. that he had previously been in a non-sexual relationship with a woman who took care of him.

Affidavit of SA Matthew McCormick
USAO#2021R01338 – 10

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

37.     L.H. stated that Sandra was a regular customer and noticed early on that Sandra was suffering from a cognitive issue, such as Alzheimer's disease or dementia. L.H. recalled one instance when Sandra came into the restaurant mad at L.H. and accused her of talking to Brown (Sandra's spouse). The next day Sandra came to the restaurant and acted like it never happened. Sandra also stated to L.H. that she met NBA player Stephen Curry's wife. L.H. stated that RADCLIFFE and his business partner, Paul WEDEBERG, would be annoyed when Sandra came to the restaurant, stated that she was "fucking annoying," and instructed L.H. to deal with Sandra. According to L.H., WEDEBERG and RADCLIFFE called Sandra either a "fucking old crack" or a "fucking old hag."

38.     L.H. stated that Sandra came to the restaurant upset one day because she was in a fight with her close friend. L.H. opined that it was a dementia-related episode. After RADCLIFFE made food for Sandra, she later came back to the restaurant and brought all her financial documents for RADCLIFFE to review. L.H. stated she saw a behavior change in RADCLIFFE after he reviewed Sandra's financial documents and described RADCLIFFE as having dollar signs in his eyes.

39.     I interviewed L.J., another former employee at Kryptonite Bar & Grill. When L.J. started working for RADCLIFFE and WEDEBERG at the end of the summer in 2019, she was introduced to Sandra. L.J. was told that Sandra would be her favorite patron and Sandra had been frequenting the restaurant for a while. L.J. was told that Sandra was alone, her neighbors were taking advantage of her, and she came into the restaurant crying asking for help. L.J. stated that RADCLIFFE and WEDEBERG did not want to help at first, but L.J. was glad that they did. L.J. stated that Sandra and RADCLIFFE were never romantically involved, and Sandra never told L.J. about any kind of relationship with RADCLIFFE. L.J. stated that she talks with WEDEBERG frequently and WEDEBERG helped her obtain a job at his place of work when L.J. struggled to find a job.

40.     After Sandra began to frequent RADCLIFFE's restaurant, her neighbors and friends saw behavior changes in Sandra. W.N. stated that Sandra started to close off from her. Sandra did not want any help from W.N. or R.N.. Murray stated that she received a call from

Affidavit of SA Matthew McCormick
USAO#2021R01338 – 11

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    Sandra, who was upset with her. Murray was unsure why Sandra was upset with her, and it

2    seemed to Murray to come out of nowhere. Sandra told E.K. that RADCLIFFE loved her, and

3    they were very happy, and were going to get married. Sandra also told Murray that Sandra

4    and RADCLIFFE were married and that RACLIFFE loved her. R.N. stated that he was

5    approached by Sandra while outside his home and Sandra told him she and RADCLIFFE

6    were married.

7        41.    During the interview with R.N., he stated that when he heard that RADCLIFFE

8    and Sandra were married from a neighbor, he asked RADCLIFFE if it was true, and

9    RADCLIFFE denied it. R.N. did state that RADCLIFFE and Sandra showed signs of

10   affection, like holding each other's hands. When R.N. was concerned about Sandra's personal

11   funds, RADCLIFFE showed R.N. printouts of Sandra's Sound Credit Union Bank accounts,

12   Fidelity account, and a third account. R.N. said everything looked good based on what he was

13   shown. R.N. stated that that there was $10,000 taken out of Sandra's account for the purchase

14   of RADCLIFFE's daughter's car, but R.N. said it was put back. RADCLIFFE told R.N. that

15   he paid $220,000 for the remodel of Sandra's property and would be reimbursed once the

16   property was sold. R.N. referred to RADCLIFFE as a scumbag, but said RADCLIFFE was

17   their scumbag and not a criminal. R.N. said he spent a lot of time with RADCLIFFE playing

18   golf, watching football, and smoking cigars.

19       42.    R.N. stated that, before Sandra's spouse died, Sandra showed signs of

20   diminished capacity. For example, Sandra believed that her spouse was pregnant with

21   chihuahuas. R.N. also stated that Sandra fell victim twice to phone scammers and he had to

22   help Sandra go to Sound Credit Union to open new accounts.

23       43.    Adult Protective Services (APS) began an investigation into RADCLIFFE on

24   July 22, 2019, when APS received a phone complaint worrying that RADCLIFFE was going

25   to sell off all of Sandra's assets leaving her destitute. On July 23, 2019, APS records state that

26   when Sandra was approached by an investigator, Sandra said that she lived in the home with

27   her husband and provided RADCLIFFE's name.

28

Affidavit of SA Matthew McCormick
USAO#2021R01338 – 12

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

44.   In July 2019, Kent MacLachlan became Sandra's financial advisor following a referral from RADCLIFFE. During the first week of August 2019, MacLachlan was contacted by Sandra's attorney, Jennifer King, and asked him to accompany her to visit Sandra. King was concerned about Sandra's relationship with RADCLIFFE. Around a week after the meeting with Sandra, MacLachlan received a call from King informing him that she had been fired. King told MacLachlan someone was trying to change Sandra's legal documents and told MacLachlan to be careful of RADCLIFFE's relationship with Sandra.

45.   On September 15, 2021, RADCLIFFE sent an email from **RADCLIFFE's Target Email: rich37r@hotmail.com** to an APS investigator and a King County Sheriff's Office (KCSO) detective. APS and KCSO were jointly investigating RADCLIFFE's relationship with Sandra. RADCLIFFE stated that Sandra asked King to revoke Murray as Power of Attorney. King did not do what was requested, which resulted in the relationship being terminated.

46.   In the summer of 2019, Murray stated she received a call from King that she was being removed from the Last Will and Testament and that she would no longer hold Sandra's Power of Attorney. Murray was surprised she had been removed but continued to stay in contact with Sandra.

47.   On or around July 18, 2019, financial records indicate that Sandra and RADCLIFFE made the following changes to Sandra's financial accounts:

- Sandra and RADCLIFFE entered an investment relationship together with MacLachlan.

- As part of their relationship with MacLachlan, RADCLIFFE was added as a joint account holder on multiple Charles Schwab accounts. A notification from Charles Schwab addressed to Sandra stated that the 100% primary beneficiary for account -7936 was RADCLIFFE.

- Bank records indicate that RADCLIFFE and Sandra signed a BECU Credit and Membership Application related to a new automobile loan. Investigators later determined that the loan was used to purchase a car for RADCLIFFE's

Affidavit of SA Matthew McCormick
USAO#2021R01338 – 13

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  Daughter. It appears that RADCLIFFE paid off the car loan with his own

2  funds.

3  • RADCLIFFE was named as a joint holder on Sandra's Computershare

4  investment account.

5  *August 2019 – September 2019*

6  48.    On or around August 7, 2019, medical records show WEDEBERG

7  accompanied Sandra on a visit to her primary care physician. The doctor noted that they had a

8  "long discussion about her [Sandra's] current situation, I am reasonably sure that Paul

9  [WEDEBERG] and Rich [RADCLIFFE] are not defrauding Sandra and that they are

10  appropriately trying to help her get outside help for power of attorney and management of her

11  investment funds". The doctor also noted that "Paul [WEDEBERG] went in with her [Sandra]

12  to see her lawyer. They came up with power of attorney to be an agency. Her attorney is

13  Jennifer. So is hoping to change her power of attorney so she can get signed up with them for

14  power of attorney." Sandra's MoCA score that day was 15 out of 30 which is considered

15  moderate cognitive impairment.[5]

16  49.    On August 14, 2019—seven days after Sandra's doctor was told an agency

17  would be used for Sandra's Power of Attorney—Sandra signed a legal document assigning

18  WEDEBERG Power of Attorney and RADCLIFFE as successor-in-fact if WEDEBERG was

19  unable or unwilling to continue as attorney-in-fact. The document authorized WEDEBERG to

20  act in her name, place, and stead with respect to real estate transactions, personal property

21  transactions, stock and bond transactions, banking and financial transactions, business

22  operation transactions, insurance and annuity transactions, estate and trust transactions, legal

23  actions, personal and family care, government benefits, retirement plan transactions, gifts, and

24  pet and animal care.

25  50.    The same day Sandra assigned Power of Attorney to WEDEBERG, her cell

26  phone service was cancelled.

27  _____

28  [5] According to mocacognition.com, a score between 10 and 17 is considered moderate cognitive impartment.

Affidavit of SA Matthew McCormick
USAO#2021R01338 – 14

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

51.     On August 16, 2019, an APS investigator visited Sandra's home and encountered WEDEBERG, who indicated that he was granted Sandra's Power of Attorney. WEDEBERG stated that he had been friends of Sandra and RADCLIFFE for a very long time. When asked how long, WEDEBERG indicated about five or six years.

52.     WEDEBERG's description of his relationship with Sandra is inconsistent with the evidence gathered during this investigation. The FBI has reviewed Sandra's and her spouse's cell phone records, among other evidence. According to these cell phone records, there were no calls between WEDEBERG [206-979-4630] and the Browns from January 1, 2018 until August 14, 2019. There were a total of seven calls from the Browns' numbers to RADCLIFFE [206-841-0636] during the month of July 2017. Zero time elapsed for all seven calls. The FBI also reviewed phone records for Sandra's Comcast phone number from July 19, 2019 to October 12, 2019. [6] According to the phone records there were 108 calls initiated from RADCLIFFE that averaged one minute long, and 245 calls to RADCLIFFE that averaged 38 seconds long. The records show that there were two calls from WEDEBERG with zero billable time, and there were no calls to WEDEBERG.

53.     Furthermore, interviews of Sandra's neighbors and friends do not support WEDEBERG's claim of a long-term friendship with Sandra before her spouse died.

54.     On August 16, 2019, medical records show WEDEBERG accompanied Sandra to the neurologist. The neurologist noted that Sandra's August 7, 2019 MoCA score of 15 out of 30 was abnormal. The neurologist noted that WEDEBERG was able to provide a good deal of the historical information about confusion that Sandra has been exhibiting. The neurologist ordered an MRI for Sandra which later showed multiple areas of small lesions in the brain— most likely relating to narrowing of microscopic blood vessels in the brain that could have contributed to Sandra's difficulty with memory.

---

[6] Comcast has a record retention policy of two years and was only able to provide records from July 19, 2019 to the day that the number was disconnected on October 12, 2019.

Affidavit of SA Matthew McCormick
USAO#2021R01338 – 15

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

55.    On September 4, 2019, Sandra received an APS visit. During the visit, Sandra exhibited a lack of awareness about the cognitive issues she was experiencing. Sandra stated that her neurologist told her that she was "doing just fine" and that she "didn't have a stroke." Sandra also stated that she saw her primary care physician and she had "perfect" health. During the home visit Sandra stated that she was not married to RADCLIFFE and that they were good friends. Sandra "was persistent that no one is touching her money." The APS investigator administered a Mini-Mental State Examination (MMSE) in which Sandra scored 18/30, which indicates moderate cognitive impairment.

56.    On September 19, 2019, Sandra followed up with her neurologist, accompanied by WEDEBERG. The neurologist's notes from that visit state: "The hippocampal volumes were measured at 87th percentile which would not be suggestive of an Alzheimer's type dementia. Sandra still reports that she is having some difficulty with her memory. However, her life is now much more stable and she seems to be doing better at this time per her friend paul [WEDEBERG]." The same September 19 visit noted a MMSE score of 28/30, which would be considered within the normal range.

*October 2019*

57.    On October 1, 2019, Kent MacLachlan, Sandra's financial advisor, emailed **WEDEBERG's Target Email Address: paul.wedeberg@comcast.net**, regarding Sandra's neurologist appointment. MacLachlan explained that his industry is highly regulated with strict rules pertaining to elderly adults and therefore he wanted to get a copy of the neurologist's medical report for his records. MacLachlan stated it is important to stay current with life changes—both mentally and physically—because they can have a big impact on how he provides financial advice. WEDEBERG responded from **WEDEBERG's Target Email Address** stating that he would send MacLachlan the report. MacLachlan never received the report from the neurologist.

58.    On October 2, 2019, a day after MacLachlan requested Sandra's medical report from WEDEBERG, Sandra signed a new Power of Attorney and Last Will and Testament. The documents named WEDEBERG as Sandra's Power of Attorney and RADCLIFFE as her

1   alternate agent if WEDEBERG was not available or became ineligible to act. The new Power
2   of Attorney gave WEDEBERG authority over Sandra's real and personal property, motor
3   vehicles, stock and bond transactions, financial institutions, safe deposit boxes, insurance and
4   annuities, beneficial interests, electronic communications and digital assets, retirement plans
5   and benefits, claims and litigation, tax matters, personal and family maintenance,
6   governmental benefits, and decisions regarding nursing homes and long-term medical care.
7   Sandra's new Last Will and Testament named RADCLIFFE and RADCLIFFE's daughter
8   Kathryn as the sole beneficiaries of Sandra's estate.
9       59.    Five days after signing the new Power of Attorney and Will, Sandra signed a
10  Residence and Services Agreement at University House, a retirement community in Issaquah,
11  Washington. RADCLIFFE and WEDEBERG were listed as Sandra's emergency contacts.
12      60.    The same day she signed the residence agreement at University House, Sandra
13  visited her primary care physician. Medical notes from that visit state that Sandra's "memory
14  is fair, worried that she scored so poorly on her first moca because she was nervous, looking
15  for a place to live moving into university house notes paul [WEDEBERG] and rich
16  [RADCLIFFE] are her PDOA currently doesn't like drastic changes MOCA done today
17  14/30." A MoCA score of 14 is consistent with moderate cognitive impairment.
18      61.    On October 24, 2019, an APS Investigator and KCSO detective had an
19  unannounced face-to-face visit with Sandra at University House. When asked what her
20  marital status was, Sandra stated that she was a widow and was currently single. However,
21  she also stated that she was in a relationship with RADCLIFFE. When asked what her
22  relationship was with RADCLIFFE, she stated that she had a close relationship with him,
23  trusted him, and loved him. Sandra stated that she had known both RADCLIFFE and
24  WEDEBERG for "fifteen years." Sandra stated that she trusted both RADCLIFE and
25  WEDEBERG. Sandra stated that she loved RADCLIFFE, and he loved her. Sandra told the
26  investigators that she had been involved with RADCLIFFE for some time. Sandra explained
27  that Murray was a cross-dresser and friend of her deceased spouse. Once Sandra's spouse
28  died, she did not want anything to do with Murray. Sandra stated that she had been connected

Affidavit of SA Matthew McCormick
USAO#2021R01338 – 17

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    to RADCLIFFE for a number of years and was very fond of him. Sandra stated that they were
2    romantic and explained that he gave her what she did not get from her spouse.

3        62.    During the visit, Sandra said that she loved living at University House and
4    explained that the plan was for her to stay there while her house was being remodeled. She
5    also explained that "Rich [RADCLIFFE] is going to live there."

6        63.    When asked about the Power of Attorney signed on August 14, 2019, Sandra
7    stated that it was something she wanted to do. She stated that she understood what is in the
8    Power of Attorney document and does not have a problem with it, and does not have a
9    problem with her assets, funds and such being taking by the Power of Attorney or "given to
10   rich" [RADCLIFFE]. Sandra made it clear that there was no written contract and that she had
11   given WEDEBERG and RADCLIFFE verbal permission to take and do things with her
12   money, funds, and assets.

13       64.    Sandra's neighbors in Sammamish had varying opinions about whether or not
14   Sandra needed to be in a retirement home. E.K. stated that when Sandra was moved to
15   University House she was "cut off" from everyone by taking control of her phone and email.
16   E.K. stated that a neighbor sent flowers to Sandra at the assisted living facility and
17   RADCLIFFE got mad that they did not ask him first, and everyone had to go through
18   RADCLIFFE before they could see Sandra.

19       65.    During my interview with L.H., she stated that, after she stopped working at
20   RADCLIFFE's restaurant and moved out of Washington, she received calls from customers
21   at the restaurant about RADCLIFFE's involvement with Sandra. L.H. tried to confront
22   RADCLIFFE and WEDEBERG, but they did not answer L.H.'s calls. L.H. decided to call
23   University House, where Sandra was staying. L.H. called and asked to speak with Sandra.
24   The University House employee asked for a callback number and stated that if anyone lived
25   there by that name, they would deliver the message. Within 30 minutes, L.H. received a call
26   from a number that her caller ID identified "Beth Priest." Sandra asked who was calling for
27   her. When L.H. identified herself, Sandra stated that she was not supposed to talk to anyone,
28   and she was "supposed to stay hidden." Sandra asked L.H. not to call her again.

Affidavit of SA Matthew McCormick
USAO#2021R01338 – 18

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

*November 2019 – December 2019*

66.     On November 7, 2019, Karin Taifour conducted a geriatric assessment of Sandra. Taifour is a licensed mental health counselor, geriatric mental health specialist, and approved clinical supervisor. She has worked in mental health with older adults for over 18 years and has taught continuing education and graduate level courses. The assessment was conducted at University House, a retirement community in Issaquah, Washington. During the assessment Sandra stated that "Rich [RADCLIFFE] is not abusing me. We love each other. He helps me, he and Paul [WEDEBERG] both." When asked about her relationship with RADCLIFFE, Sandra said "We loved each other from day one." When asked if they had been romantic for a long time, Sandra said "The whole time I've known him." When asked about the remodeling work being done at her house, she stated RADCLIFFE was helping her to make it easier for her and that it was going to cost around $60,000 and they hoped to move back in around Christmas. When asked who was paying for the remodeling Sandra stated, "It's his money, he said he'd pay for it."

67.     Sandra stated that she was moved into University House so that her house could be worked on. Before she moved into University House, Sandra stated they she and "Rich" [RADCLIFFE] lived together in her house on the lake and planned to move back in together after it was finished. Sandra stated that she sees RADCLIFFE and WEDEBERG every day. Sandra stated that RADCLIFFE works until 10pm or even the middle of the night then comes up to be with her. When asked how well she knew RADCLIFFE's daughter, Kathryn, Sandra stated that in her will she is paying for Kathryn's entire college education wherever she [Kathryn] goes with no limit. Sandra stated that "Evergreen Ford covers everything Kathryn needs." [Evergreen Ford is a Ford car dealership in Issaquah, Washington.] When asked to clarify, Sandra stated that "Rich [RADCLIFFE] has a relationship with Evergreen Ford for everything". Sandra stated that after Kathryn's college expenses are paid, everything goes to RADCLIFFE. When asked how much the University House apartment cost, Sandra stated that she did not know, and that RADCLIFFE handles the money. When asked if she reviews her account statements with RADCLIFFE, she said no. When asked what she would do if she

Affidavit of SA Matthew McCormick
USAO#2021R01338 – 19

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    had any concerns about money missing from her accounts she said, "I'd talk to him, tell him

2    to knock it off."

3          68.      Taifour asked Sandra when she last saw her doctor, and Sandra could not recall.

4    When Sandra was reminded that she had seen a neurologist, she stated, "Rich [RADCLIFFE]

5    wanted me to see him and make sure everything is ok. He told me that I was fine. He told

6    Paul [WEDEBERG] I'm never going to have dementia ever in my life." Taifour asked if she

7    had ever had any kind of test or questions to see how her memory is and she said "Yes, I

8    passed them all with flying colors. I got everything perfect." Taifour used multiple testing

9    tools that are clinically researched and validated to assess Sandra's cognition and memory.

10   On the St. Louis University Mental Status exam Sandra scored 13 out of 30, indicating

11   dementia-level cognitive impairment. On the MoCA she scored 15 out of 27, which and

12   Taifour assessed that this indicated significant cognitive impairment. On the Rowland

13   Universal Dementia Assessment Scale exam, she scored 14 out of 30 indicating dementia-

14   level cognitive impairment. The Trail Making Test A&B indicated impairment.

15         69.      Taifour wrote that Sandra had significant deficits in multiple areas of thinking

16   and memory. Taifour was concerned by the language in Sandra's neurologist and primary

17   care physician notes that indicated they relied, likely heavily, upon WEDEBERG as an

18   informer of Sandra's functioning, which may not be appropriate or reliable. The report stated

19   that, as is the case with most people with memory problems, Sandra likely forgot about,

20   minimized, or did not want to admit to, any problems with memory and thinking that she

21   experienced. Taifour was also troubled by the language in the neurologist notes that stated

22   that "memory competency normal 87 percentile." She noted that the 87th percentile refers to

23   the hippocampus volume measured in the MRI, while the hippocampus does play an essential

24   role in memory and cognition, in no way can it be considered an indicator of "competency,"

25   nor can competency be measured in percentiles. The report stated that Sandra demonstrated

26   cognitive performance deficits in several areas essential to her being able to understand her

27   situation and relevant information. As a result of these deficits, Taifour stated that Sandra

28   appeared to be unable to use information and logic to see consequences of different options or

Affidavit of SA Matthew McCormick
USAO#2021R01338 – 20

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  likely outcomes of different actions. Because executive functioning is key to being able to

2  evaluate, sequence, adjust, and interpret information, Sandra appeared to not be capable of

3  taking appropriate action to protect her finances and assets. Sandra did not appear to be able

4  to consider the possibility of any problems or to see the consequences of such problems.

5      70.    Taifour concluded her report from the November 7 assessment stating that

6  Sandra appeared to be under significant undue influence from RADCLIFFE and

7  WEDEBERG, and she was unable to recognize the risk or impact this has had on her

8  financial or personal circumstances. At the time of the visit, the evidence showed Sandra did

9  not demonstrate decision making capacity to manage her finances, medical care, or personal

10 affairs. Taifour recommended that APS and law enforcement secure a vulnerable adult

11 protection order, that Sandra be referred for neuropsychological testing, or that APS pursue at

12 least financial guardianship of Sandra.

13     71.    On December 24, 2019, APS Investigators and KCSO Detective conducted

14 another unannounced interview with Sandra. During the interview Sandra spoke a lot about

15 her friend "Rich" [RADCLIFFE] and how they had a relationship and that she believed

16 someday that they will be married. Sandra raved about how RADCLIFFE has "lots of

17 money...more than me... and that he pays for everything..." APS noted that Sandra used the

18 name Rich "Radford," and not RADCLIFFE, to refer to the person she believed was her

19 significant other. Sandra repeatedly stated that whoever made the report to APS was jealous

20 that she has Rich [RADCLIFFE] and they do not.

21     72.    On December 26, 2019, Dr. Carrie B. Rubenstein performed a geriatric

22 assessment of Sandra. During the assessment Sandra did not remember having a stroke in

23 November of 2018. Sandra told Dr. Rubenstein that she had known RADCLIFFE "for a long

24 time" and WEDEBERG for the past five years. WEDEBERG stated that Sandra had only

25 known RADCLIFFE for five years. Sandra reported that her relationship with RADCLIFFE

26 was romantic, but WEDEBERG denied it. Sandra stated, "I love him and he loves me."

27 Sandra mentioned that Murray was a friend of Brown [Sandra's spouse] but not her and

28 Sandra had a falling out with Murray over Murray's boat. Dr. Rubenstein reported that Sandra

Affidavit of SA Matthew McCormick
USAO#2021R01338 – 21

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  acknowledged that she may have some memory problems, but later in the interview stated, "I
2  have no memory problems, I'm doing fine."

3      73.    WEDEBERG stated that Sandra had trouble driving and had gotten lost. Sandra
4  reported that to help with this she "bought Evergreen Ford." The report states that Sandra
5  thought she bought the company, which WEDEBERG denied and clarified that Sandra
6  bought a car from Evergreen Ford but not the company. Sandra reported she had no financial
7  worries because "Rich [RADCLIFFE] told me everything is fine." Sandra said she had an
8  accountant who she felt was excellent. Sandra was worried that people were trying to get her
9  money but unable to specifically state who she was worried about.

10     74.    With WEDEBERG out of the room, Sandra reported that she was romantically
11  involved with RADCLIFFE. During this examination Sandra's MoCA score was 13 out of
12  30, with deficits most marked in executive function, language, and delayed recall. The report
13  opined that functional decline began after stroke in November of 2018, and this is most
14  consistent with vascular dementia. Dr. Rubenstein reported that, based on consistent scores
15  showing moderate cognitive deficit, some behavioral symptoms (which include delusions),
16  and functional decline in ability to care for self, Dr. Rubenstein believed Sandra had "mid-
17  stage dementia, major neurocognitive disorder with behavioral disturbance . . . ." Dr.
18  Rubenstein reported that Sandra had virtually no insight into her cognitive deficits.

19     75.    In regard to capacity, Dr. Rubenstein stated that while Sandra likely had the
20  capacity to name the people she wanted to help her make medical and financial decisions, she
21  did not have the executive capacity to manage her personal affairs, or to execute decisions
22  regarding her finances or living situation. Dr. Rubenstein was concerned that Sandra would
23  not be able to identify risks with regards to outside influences, given her mid-stage dementia
24  and limited insight.

25     76.    During the month of December 2019, RADCLIFFE and WEDEBERG moved
26  Sandra out of University House and into Sunrise of Bellevue ("Sunrise"), an assisted living
27  facility located in Bellevue, Washington. Sunrise staff routinely write notes about individuals
28  in their care. I reviewed the Sunrise notes associated with Sandra. The notes reflect that

Affidavit of SA Matthew McCormick
USAO#2021R01338 – 22

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  Sandra appeared to be struggling with her dementia during her time at the facility. The staff

2  noted that Sandra was anxious and wandered around the floors using the stairs. It was noted

3  that Sandra went outside for a walk and a care manager had to walk her back to the

4  community because she did not know how to get back.

5       77.    RADCLIFFE and WEDEBERG paid the invoices for Sandra's care at

6  University House and Sunrise, in full, until she passed away in November 2020. Due to the

7  commingling of RADCLIFFE's and Sandra's funds, as well as the frequent transfers between

8  accounts, it is difficult for investigators to determine whose funds were used to pay for

9  Sandra's care. RADCLIFFE later told a King County Sheriff's detective that a portion of the

10  money he withdrew from Sandra's funds for his personal use included reimbursement for

11  Sandra's care expenses.

12           *December 2019 – February 2020: Evidence from Sunrise*

13      78.    B.G., an assisted living coordinator at Sunrise, noted that Sandra did not have

14  enough clothes and supplies. A night shift care manager reported that Sandra was observed

15  with her dog around 5:00 a.m. It was documented that Sandra would become anxious and

16  begin crying saying "I am so afraid, lost and nobody to turn too [sic]. I was told that they will

17  come pick me up. I am already ready, I called and text Rich [RADCLIFFE], no answer

18  received. I texted Paul [WEDEBERG] and told me that he is still out of the state." Sandra

19  also stated, "I can't wait for him [RADCLIFFE] to finish the house so that we can move

20  together."

21      79.    On February 27, 2020, B.G. wrote that Sandra "usually spends time in the lobby

22  and there are times that she wants to go out and more to look [for] her family/friend/POA."

23  Sandra will not remember to tell anyone that she is leaving and may not be able to find her

24  way home. During a meeting with RADCLIFFE and WEDEBERG, they were asked if they

25  were willing to get companion care to help with outdoor activities. They declined the request

26  and said that due to financial shortage they would not be able to hire companion care. They

27  suggested using a love note reminder notebook. Later B.G. wrote that Sandra "needs lots of

28

Affidavit of SA Matthew McCormick
USAO#2021R01338 – 23

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    1:1/redirection/reassurance. POA [Power of Attorney] said resident [Sandra] cant afford to

2    add companion care."

3        80.    I interviewed B.G. and she stated that Sandra was always happy when

4    RADCLIFFE was around. Sandra liked WEDEBERG but B.G. could tell that Sandra had

5    feelings for RADCLIFFE. Sandra wanted to do whatever would make RADCLIFFE happy. If

6    there was anything that Sandra did not want to do, the staff would mention that she needed to

7    do it for RADCLIFFE and she instantly changed her mood and would be willing to do it "for

8    RADCLIFFE." B.G. stated that whenever Sandra needed any increase in level of care or

9    anything to support her care, B.G. would speak to RADCLIFFE and WEDEBERG.

10        81.    B.G. stated that any decision that involved money was difficult. RADCLIFFE

11    and WEDEBERG would always question why Sandra needed something that could cost more

12    money. During the first couple of months that Sandra was at Sunrise, her care needed to be

13    increased because she was not able to take care of herself and do basic daily tasks. According

14    to B.G., even if RADCLIFFE and WEDEBERG saw Sandra's need, they still did not want to

15    pay more. B.G. recalled a conversation with RADCLIFFE and WEDEBERG about Sandra

16    needing basic items like underwear, bras, pants that fit, sanitary items, and incontinence

17    items. RADCLIFFE and WEDEBERG pushed back because they did not want to spend the

18    money. B.G. stated that "if you asked them for five items for Sandra, they would only agree

19    to pay for two." RADCLIFFE and WEDEBERG would begrudgingly agree to buy Sandra

20    things that she needed but would not get sufficient quantity of whatever she needed.

21        82.    According to B.G., as a result of her dementia, Sandra needed frequent one-on-

22    one redirections and assurance. Sandra would be emotional, and she needed someone to

23    validate her feelings. B.G. ended up being the one who would give her the redirections and

24    assurances because her office was next to Sandra's room. B.G. felt that she was unable to

25    provide Sandra with the appropriate level of care because B.G. had other residents she needed

26    to attend to. B.G. again suggested to RADCLIFFE and WEDEBERG that they hire

27    companion care so that Sandra would have someone to give her the reassurance she needed

28    because of her dementia. B.G. stated that it would have greatly benefited Sandra for the last

Affidavit of SA Matthew McCormick
USAO#2021R01338 – 24

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   year of her life to have companion care. B.G. estimated that around 2020, companion care
2   would have cost around $33 an hour. B.G. could not remember if she recommended 12 or 24
3   hours a day. RADCLIFFE and WEDEBERG declined the companion care because they
4   claimed that Sandra could not afford it.

5        83.    Financial records indicate that towards the end of the February 2020, Sandra
6   had more than $300,000 in cash, $900,000 in an IRA account, and a home worth
7   approximately $2,600,000 (according to third-party real estate valuation tools).

8        84.    I have reviewed publicly available posts on **RADCLIFFE's Target Facebook**
9   **Account: rich.radcliffe2**. This Facebook account contains numerous photographs of
10  RADCLIFFE and of RADCLIFFE's daughter Kathryn. **RADCLIFFE's Target Facebook**
11  **Account** also references numerous events and locations that I know to be consistent with
12  events and locations in RADCLIFFE's life.

13       85.    On February 25, 2020—two days before B.G. documented that RADCLIFFE
14  and WEDEBERG declined companion care for Sandra because "she could not afford it"—
15  two photos were posted on **RADCLIFFE's Target Facebook Account**. The first photo is
16  labeled "Moving day" and the photo shows RADCLIFFE in the bed of a truck sitting on a
17  bean bag chair, and the second photo is labeled "New evening view. Not bad", which shows
18  the view of Lake Sammamish from Sandra's house.

19
20   
21
22
23
24
25
26
27
28

Affidavit of SA Matthew McCormick
USAO#2021R01338 – 25

86.    In a subsequent post, RADCLIFFE referred to Sandra's house as "casa de Radcliffe":



### D.    RADCLIFFE's Financial Transactions Involving Sandra's Money

87.    On September 13, 2021, in a recorded interview with a KCSO detective and APS investigator, RADCLIFFE claimed that WEDEBERG acted as Power of Attorney for all of Sandra's financial decisions, and RADCLIFFE acted as Power of Attorney for all of Sandra's medical decisions. RADCLIFFE claimed that he did not use any of Sandra's money for his own benefit. However, the FBI's review of RADCLIFFE's and Sandra's financial account records showed that RADCLIFFE accessed Sandra's bank account and used her money for his own benefit.

88.    For example, on or around December 2019, a KeyBank account ending in -8085 was created with RADCLIFFE and Sandra being the co-signers on the account.

89.    In the September 13 interview with APS and KCSO, RADCLIFFE stated that he funded all the money that went into the KeyBank account -8085. He was adamant that the money in that account was not Sandra's money.

Affidavit of SA Matthew McCormick
USAO#2021R01338 – 26

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

90.     On September 15, 2021, RADCLIFFE sent a follow-up email—from **RADCLIFFE's Target Email**—to APS and KCSO again claiming that "the KeyBank account" "never had anything to do with Sandra".

91.     On September 27, 2021, RADCLIFFE sent a second follow-up email from **RADCLIFFE's Target Email** to APS and KCSO stating that Sandra's finances were never at risk, nor were they used at any time for his or WEDEBERG's benefit. RADCLIFFE noted the KeyBank account -8085 was funded by RADCLIFFE and claimed that Sandra did not contribute to that account.

92.     The same September 27 email contained a PDF file that detailed the amount RADCLIFFE claimed to have spent on the renovation of Sandra's home and other expenses relating to Sandra. This email was a forwarded email that showed to be originally from **WEDEBERG's Target Email** and sent to **RADCLIFFE's Target Email**. The total amount that RADCLIFFE claimed to have spent on Sandra's care, funeral expenses, and home renovations, using his own funds, was $842,050. Of this amount, RADCLIFFE claimed that he paid at least $277,000 in cash.

93.     RADCLIFFE's statements about KeyBank account -8085 are inconsistent with KeyBank's records regarding that account. The first of two deposits into KeyBank account -8085 included a check for around $104,000 from Northwestern Mutual payable to Sandra as a life insurance benefit following the death of Sandra's spouse, Robert (Carolyn) Brown. The second deposit into KeyBank account -8085 was a check for around $38,000 from Charles Schwab addressed to Sandra Brown and Richard Radcliffe. Financial Advisor MacLachlan later clarified to investigators that the $38,000 check from Charles Schwab was the required minimum distribution from Sandra's IRA and therefore belonged to Sandra.

94.     As of December 12, 2019, KeyBank account -8085 was funded entirely with Sandra's money. On that date, RADCLIFFE wrote a check from KeyBank account -8085 for $125,000 payable to the Radcliffe Restaurant Group. On December 20, 2019, RADCLIFFE returned a percentage of the funds he had withdrawn by initiating a transfer of around

1  $81,000 from a KeyBank account ending in -7089 (an account held solely by RADCLIFFE)
2  into the KeyBank account -8085.

3     95.    On January 2, 2020, RADCLIFFE withdrew $60,000 from KeyBank account -
4  8085 in the form of a check payable to Scott Armijo. Scott Armijo was the agent for the
5  construction worker who performed the renovation at Sandra's home. In an email sent from
6  **RADCLIFFE's Target Email** to APS on September 15, 2021, RADCLIFFE stated that he
7  had assumed financial responsibility for Sandra, including the renovating her home, because
8  Sandra did not have the financial liquidity to handle the cost. In the email, he claimed the
9  $60,000 payment to Scott Armijo was from his [RADCLIFFE's] own money.

10     96.    Based on my training and experience in financial investigations, these financial
11  transactions are consistent with an intent to conceal the nature, source, and ownership of the
12  funds.

13     97.    Having reviewed the publicly available posts on **RADCLIFFE's Target**
14  **Facebook Account**, it appears that Scott Armijo and RADCLIFFE were Facebook friends
15  who interacted with one another on Facebook during the relevant time frame, as shown by the
16  following post:

17
18  
19
20
21

22     98.    The publicly available information on **RADCLIFFE's Target Facebook**
23  **Account** contains additional evidence about RADCLIFFE's financial activities while he had
24  full access to Sandra's financial accounts. For example, on January 9, 2020, **RADCLIFFE's**
25  **Target Facebook Account** indicated that he was traveling to Las Vegas, Nevada:
26
27
28

Affidavit of SA Matthew McCormick                          UNITED STATES ATTORNEY
USAO#2021R01338 – 28                                       700 STEWART STREET, SUITE 5200
                                                           SEATTLE, WASHINGTON 98101
                                                           (206) 553-7970



99.     On January 16, 2020, **RADCLIFFE's Target Facebook Account** indicated that he was flying to Puerto Vallarta, Mexico:

100.    Two days later, **RADCLIFFE's Target Facebook Account** posted about a trip in a private jet:

Affidavit of SA Matthew McCormick
USAO#2021R01338 – 29

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970



101.   On February 18, 2020, RADCLIFFE transferred the balance of account -8085 ($41,335.31) to a KeyBank account ending -8571 (an account held jointly by RADCLIFFE and Sandra at the time of the transfer). Before this transfer, the account balance in KeyBank account -8571 was $261.52. A day after the transfer, there is a withdraw for $20,000 for a payment to an American Express account ending in -4001 (an account held solely by RADCLIFFE).

102.   The FBI reviewed charges on RADCLIFFE's American Express account -4001. Charges that listed on his statement included:

- a $355.31 charge from Venetian/Palazzo in Las Vegas (a hotel/casino)
- a $159.99 charge from Mirage The Hotel & Casino in Las Vegas
- a $422.43 charge from Venetian/Palazzo in Las Vegas,
- a $11,650.07 from Royal Princess in Santa Clarita California (a cruise line), and
- $930 from Ticketmaster.

103.   On March 4, 2020, Sunrise employee B.G. authored the aforementioned note indicating that Sandra's Power of Attorney said Sandra could not afford to add companion care.

Affidavit of SA Matthew McCormick
USAO#2021R01338 – 30

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

104.    On March 18, 2020, as the COVID-19 pandemic was accelerating, WEDEBERG instructed Sandra's financial advisor, Kent MacLachlan, to liquidate all securities in Sandra's IRA account. During the call, WEDEBERG told MacLachlan that he felt it was in Sandra's best interest to have everything in cash. The following day, Financial Advisor MacLachlan terminated the financial advisor relationship and wrote a note about this transaction in his account records, "For the record—I did not want to execute these trades but acted on the authority of the Power of Attorney Sandra Brown had given to Paul Wedeberg."

105.    On October 6, 2020, RADCLIFFE called Charles Schwab claiming that Sandra wanted to purchase real estate and indicating Sandra would be cashing out her Individual Retirement Account (IRA) account -7936 worth approximately $867,000.00. RADCLIFFE was denied access to the account. The following day, WEDEBERG completed Power of Attorney paperwork with Charles Schwab.

106.    Two weeks later, on October 21, 2020, RADCLIFFE and WEDEBERG arranged for the entire balance of Sandra's Charles Schwab Account -7936 be wired to Sandra's BECU account -6467.

107.    Five days later, RADCLIFFE wired approximately $760,000 in Sandra's name from BECU account to an escrow account for the purchase of a beach house in North Carolina.

108.    **RADCLIFFE's Target Facebook Account** referenced the real estate purchase:

Affidavit of SA Matthew McCormick
USAO#2021R01338 – 31

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970



109.    Sandra passed away on November 20, 2020.

110.    In an interview, Allen Flintoft, the owner of Flintoft's Funeral Home and Crematory, described meeting with RADCLIFFE and WEDEBERG about Sandra's funeral arrangements. According to Flintoft, RADCLIFFE and WEDEBERG told Flintoft that they wanted to do everything as cheap as possible because there was not a lot of money in the estate. RADCLIFFE and WEDEBERG did not want to post an obituary or notice about Sandra's death.

111.    On or about December 18, 2020, RADCLIFFE, now acting as executor of Sandra's estate, completed the sale of Sandra's Lake Sammamish home for $2.6 million.

**E.    Information Regarding the Target Email Accounts**

112.    On December 22, 2022, the Honorable S. Kate Vaughan, United States Magistrate Judge for the Western District of Washington, issued court orders compelling Microsoft and Comcast to provide account records relating to **RADCLIFFE's Target Email**

1  (Microsoft), **WEDEBERG's Target Email** (Comcast), and Sandra Brown's known email

2  address: **bo.sa@comcast.com**. *See* PT22-275; PT22-276.

3       113.    Comcast records show the subscriber of **WEDEBERG's Target Email** is Paul

4  WEDEBERG with a service address of 458 243rd PL SE Sammamish, WA. The records show

5  that a total of four times between October 1, 2019, and October 7, 2019, there were email

6  communications between **WEDEBERG's Target Email** and Sandra Brown's known email

7  address: **bo.sa@comcast.net**. Three of the emails originated from WEDEBERG, and one

8  originated from Sandra **[bo.sa@comcast.net]**.

9       114.    Comcast records show the subscriber for the **bo.sa@comcast.net** was Sandra

10  K. Brown with a service address of 3515 E LK Sammamish Shore LN SE, Sammamish, WA.

11  The account had been disconnected and no email communications records available for that

12  account.

13       115.    Comcast records show there were a total of 208 emails communication between

14  **WEDEBERG's Target Email** and **RADCLIFFE's Target Email** between May 13, 2019,

15  and February 25, 2021. There were 168 emails that originated from **WEDEBERG's Target**

16  **Email**, 39 that originated from **RADCLIFFE's Target Email**, and one that originated from

17  Sandra **[bo.sa@comcast.net]** that went to both **WEDEBERG's Target Email** and

18  **RADCLIFFE's Target Email**.

19       116.    Microsoft provided records pertaining to **RADCLIFFE's Target Email**.

20  Records show there were nine emails between **RADCLIFFE's Target Email** and Sandra

21  **[bo.sa@comcast.net]** between September 30, 3019 and December 18, 2020. Seven emails

22  originated from Sandra **[bo.sa@comcast.net]** and went to **RADCLIFFE's Target Email** and

23  **WEDEBERG's Target Email**. **RADCLIFFE's Target Email** sent two emails to Sandra's

24  email address **[bo.sa@comcast.net]** on December 18, 2020, approximately a month after

25  Sandra had passed.

26       **F.    COVID-19 Fraud**

27       117.    The FBI's investigation also revealed that, while WEDEBERG and

28  RADCLIFFE were acting as Power of Attorney for Sandra Brown, they also engaged in

Affidavit of SA Matthew McCormick
USAO#2021R01338 – 33

COVID-19 fraud schemes. Specifically, they submitted false statements in support of applications for a Payment Protection Program (PPP) loan and Pandemic Unemployment Assistance.

### i. PPP Loan Fraud

118.    Based on publicly available information, I know that on March 27, 2020, the United States enacted into law the Coronavirus Aid, Relief, and Economic Security ("CARES") Act. The CARES Act authorized approximately $2 trillion in aid to American workers, families, and businesses to mitigate the economic consequences of the COVID-19 pandemic.

119.    PPP loans were part of a U.S. Small Business Administration program that that provided relief through the CARES Act. The CARES Act authorized up to $349 billion in forgivable loans to small businesses for job retention and certain other expenses. In or around April 2020, Congress authorized over $300 billion in additional PPP funding. In or around December 2022, Congress passed the Consolidated Appropriations Act, 2021, which added $284.5 billion in funding for PPP loans and allowed certain entities to apply for a second draw of a PPP loan.

120.    In order to obtain a PPP loan, a qualifying business was required to submit a PPP loan application signed by an authorized representative of the business. The PPP loan application required the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan. In the PPP loan application for sole proprietors and independent contractors, the small business (through its authorized representative) was required to state, among other things, its gross income for 2019 or 2020. These figures were used to calculate the amount of money the small business was eligible to receive under the PPP. In addition, sole proprietors and independent contractors applying for a PPP loan were required to provide documentation showing their gross income for 2019 or 2020.

121.    PPP loan applications were processed by a participating lender. If a PPP loan application was approved, the participating lender funded the PPP loan using its own monies,

Affidavit of SA Matthew McCormick
USAO#2021R01338 – 34

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  which were 100% guaranteed by SBA. Data from the application, including information
2  about the borrower, the total amount of the loan, and the listed number of employees, was
3  transmitted by the lender to the SBA in the course of processing the loan.

4      122.    PPP loan proceeds were required to be used by the business on certain
5  permissible expenses – payroll costs, interest on mortgages, rent, and utilities. The PPP
6  allowed the interest and principal on the PPP loan to be entirely forgiven if the business spent
7  the loan proceeds on the allowable expenses within a designated period of time and used a
8  certain percentage of the PPP loan proceeds on payroll expenses. The Consolidated
9  Appropriations Act, 2021, expanded the allowable expenses to other types of business
10 expenses.

11     123.    On October 3, 2019, the Radcliffe Restaurant Group was administratively
12 dissolved and became inactive, according to the public portal of the Washington State Office
13 of the Secretary of State.

14     124.    On April 22, 2020, WEDEBERG signed, dated, and submitted a PPP
15 application on behalf of the Radcliffe Restaurant Group. On the PPP application,
16 WEDEBERG was listed as the owner and WEDEBERG signed all the loan application
17 documents. However, RADCLIFFE's phone number (i.e., 206-841-0636) was used as the
18 primary phone contact and **RADCLIFFE'S Target Email** was used as the primary email
19 contact.

20     125.    WEDEBERG's application affirms that he had 100% ownership of the Lake
21 Sammamish restaurant. The loan application stated that the Radcliffe Restaurant Group
22 employed 12 employees. The Employer Identification Number (EIN) for the Radcliffe
23 Restaurant Group was listed as 82-5356163.

24     126.    The PPP application included an additional document stating that two jobs
25 were created, and twelve jobs were retained.

26     127.    I interviewed J.P., who worked for RADCLIFFE at his restaurants as a cook.
27 J.P. stated that he worked for RADCLIFFE for a total of two years with a break in the middle
28 between stints. J.P. stated that he was one of the three employees remaining when the

Affidavit of SA Matthew McCormick
USAO#2021R01338 – 35

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  restaurant went out of business in March 2020. J.P. then helped close the restaurant, which is

2  when he was last paid for his employment.

3      128.    During the interview with L.J. (another former employee, previously referenced

4  in this affidavit), she stated that there were between two and four employees working when

5  the restaurant closed down. Toward the end, the restaurant only received 17 orders on a good

6  night. L.J. did not remember the last time she was paid but did state that she did not receive

7  any payment after the restaurant closed down.

8      129.    Two IRS Tax Form 941 documents [Employer's Quarterly Federal Tax

9  Returns] for the Radcliffe Restaurant Group were included with the PPP application. The

10  forms were purportedly for the fourth quarter of 2019 and the first quarter of 2020. Form 941

11  for the fourth quarter of 2019 used EIN 82-5356163 and listed 14 employees. The form was

12  signed by WEDEBERG on April 22, 2019—over five months prior to the start of the fourth

13  quarter. Form 941 for the first quarter of 2020 used EIN 82-5356163 and listed 11 employees.

14  The form was signed by WEDEBERG on April 22, 2020. These Form 941 documents are

15  fraudulent. As of July 26, 2023, IRS records indicate that no Form 941s were ever filed for

16  Radcliffe Restaurant Group (EIN 82-5356163).

17      130.    I received a letter dated June 7, 2022, from Washington State's Employment

18  Security Department (ESD) regarding the Radcliffe Restaurant Group (Unified Business

19  Identifier number 604-285-015). The letter states that the Radcliffe Restaurant Group is not

20  registered with ESD and that there were no records for the Radcliffe Restaurant Group from

21  January 1, 2019 to June 7, 2022 (date of letter).

22      131.    The following are excerpts of the certifications that WEDEBERG made

23  initialing next to each certification:

24      a.  "The Funds will be used to retain workers and maintain payroll or make

25          mortgage interest payments, lease payments, and utility payments as specified

26          under the Paycheck Protection Program Rule, I understand that if the funds are

27          knowing used for unauthorized purposes the federal government may hold me

28          legally liable, such as charges of fraud."

Affidavit of SA Matthew McCormick
USAO#2021R01338 – 36

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

b. I further certify that the information provided in this application and the information provided all supporting documents and forms is true and accurate in all material respects. I understand that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law, including under 18 USC 1001 and 3571 by imprisonment of not more than five years and/or a fine up to $250,000 under 15 USC 645 by imprisonment of not more than two years and/or a fine of not more than $5,000; and, if submitted to a federally insured institution, under 18 USC 1014 by imprisonment of not more than thirty years and/or a fine of not more than $1,000,000.

132.    On April 25, 2020, Chase Bank loan documents show that the loan balance of $76,810 was funded. On May 5, 2020, there was a wire deposit of $76,810 with the description of "Small Business N/A Credit" into Chase Bank account -9283. The account title of Chase account -9283 is "Radcliffe Restaurant Group LLC." RADCLIFFE is the only individual listed on Chase account -9283.

133.    Two days after the PPP loan funds were deposited into RADCLIFFE's Chase account -9283, there was a $100,000 online transfer from that account to Chase bank account -1692. The account title of Chase account -1692 is "Radcliffe D Radcliffe." RADCLIFFE is the only individual listed on Chase account -1692. Using the Lowest Intermediate Balance Rule (LIBR)[7] method, approximately $61,000 of the $100,000 transfer from Radcliffe Restaurant Group to RADCLIFFE's personal bank account can be attributed to the fraudulently obtained PPP loan.

134.    On November 9, 2020, the entire balance of the Chase account -1692 (including the $61,000 attributed to the PPP Loan) was deposited into KeyBank account -7871. Bank records show the customers on KeyBank account -7871 were RADCLIFFE and RADCLIFFE's daughter Kathryn.

---

[7] LIBR is an accounting principle that relates to the tracing of commingled funds. When a person commingles wrongfully obtained funds with his or her own funds, LIBR assumes that a person spends his or her own money before spending wrongfully obtained funds.

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5200
Seattle, Washington 98101
(206) 553-7970

135. On November 16, 2020, there was a wire transfer from KeyBank account -7871 to North River Title for $279,884.81. Using the LIBR method, approximately $56,000 of the $279,884.81 can be attributed to the fraudulent PPP loan. Records from North River Title, Inc. show the wire of $279,884.81 was used to purchase the property located at 1426 Paul W Bryant Drive, Unit 11, Tuscaloosa, AL 35401 (a condo near the University of Alabama campus, where Kathryn Radcliffe was a student). Therefore approximately 73% of the PPP loan was used to purchase a personal property.

136. Based on my training and experience in financial investigations, these financial transactions are consistent with an intent to conceal the nature, source, and ownership of the funds.

137. The FBI has not identified any evidence that the PPP loan funds were used to fund employee payroll for the Radcliffe Restaurant Group (or any related restaurant entity).

### ii. Pandemic Unemployment Assistance Fraud

138. Beginning in or around March 2020, in response to the COVID-19 pandemic, several federal programs expanded unemployment benefits eligibility and increased benefits, including Pandemic Unemployment Assistance (PUA) Program, Federal Pandemic Unemployment Compensation, and the Lost Wages Assistance Program. These benefits were administered through a joint state and federal program that provided monetary benefits to eligible beneficiaries. Unemployment benefits were intended to provide temporary financial assistance to lawful workers who were unemployed through no fault of their own.

139. According to documentation provided by ESD, an individual is eligible for PUA if the individual unemployed, partially unemployed, unable or unavailable for work for one of the following reasons (quoting ESD loan documents):

  a. You have received a COVID-19 diagnosis.

  b. You are experiencing symptoms of COVID-19 and seeking a medical diagnosis.

  c. An individual in your household has been diagnosed with COVID-19.

  d. You are providing care for a family member or household member who has been diagnosed with COVID-19.

Affidavit of SA Matthew McCormick
USAO#2021R01338 – 38

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

e. A child or other household member for which you have primary caregiving responsibilities is out of school, daycare, or other facility due to closure as a direct result of the COVID-19 public health emergency.

f. You cannot reach your place of employment because of quarantine imposed as a result of the COVID-19 public health emergency.

g. You are unable to reach your place of work because you have been advised by a health care provider to self-quarantine due to concerns related to COVID-19.

h. You were scheduled to start a job but no longer have a job or are unable to reach the job as a direct result of the COVID-19 public health emergency.

i. You became the breadwinner or major support for a household because the head of household died as a direct result of COVID-19.

j. You had to quit as a direct result of COVID-19.

k. Your place of employment closed as a direct result of the COVID-19 public health emergency.

l. You are an independent contractor or self-employed individual and your ability to do your work has been affected or your place of business closed as a direct result of the COVID-19 public health emergency.

140. On or about May 13, 2020, RADCLIFFE used the Internet to submit a fraudulent application for PUA benefits. His application falsely stated that he had been employed by a restaurant business entity named "Uncle Si's Inc.," and that he had been rendered unemployed by the COVID-19 pandemic. In truth, RADCLIFFE sold his restaurant entity to WEDEBERG several months before the COVID-19 pandemic and was not employed by WEDEBERG when the restaurant closed.

141. On November 20, 2019, RADCLIFFE created a post using **RADCLIFFE's Target Facebook Account** addressed to the City of Sammamish community. RADCLIFFE stated, "After 7+ years of 24X7 making food and having fun (mostly) it is time for me to retire, leaving the joint in the trusty hands of Paul [WEDEBERG]-my partner in crime all these years, so that I can focus on other things, like health, my daughter, and sunshine."

Affidavit of SA Matthew McCormick
USAO#2021R01338 – 39

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  RADCLIFFE also discussed that, in the wake of his "retirement", the restaurant Kryptonite

2  would continue to operate, and that RADCLIFFE may be there from time to time.

3          142.    On December 30, 2019, **RADCLIFFE's Target Facebook Account** posted

4  that RADCLIFFE finished his last work trip, and it is "time to go be an unemployed bum."

5  On January 5, 2020, a life event was posted on **RADCLIFFE's Target Facebook Account**

6  stating that RADCLIFFE "Started New Job at Happily Retired:



18          143.    I interviewed Carl Determeyer, an Investigation Supervisor of the office of

19  Special Investigations for the ESD. Determeyer confirmed that RADCLIFFE submitted his

20  application for PUA in May of 2020. Determeyer stated that PUA is for unemployment that is

21  related to the pandemic. Determeyer confirmed that if RADCLIFFE was the owner of a

22  restaurant and sold the restaurant in 2019, that RADCLIFFE would not qualify for PUA

23  benefits.

24          144.    In the interview with one of RADCLIFFE's former employees, J.P., he stated

25  that WEDEBERG was the manager of the restaurant when RADCLIFFE owned the business.

26  J.P.'s employment ended around February or March of 2020. J.P. stated that at the time of the

27  restaurant closing, the business was in WEDEBERG's name and not RADCLIFFE's name.

28  RADCLIFFE did not have an apparent decision-making role in the business towards the end,

Affidavit of SA Matthew McCormick
USAO#2021R01338 – 40

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  but he still came in every night to drink alcohol. J.P. did not believe RADCLIFFE was

2  employed by WEDEBERG in any capacity.

3        145.    In the claimant registration for unemployment, RADCLIFFE listed the

4  **RADCLIFFE Target Email** as his contact email. On May 12, 2020, RADCLIFFE added

5  additional employment data to his unemployment claim. RADCLIFFE submitted the effective

6  date of claim as March 15, 2020. RADCLIFFE listed his employer's name as Uncle Si's Inc.

7  and stated that he started working for the employer March 1, 2012. March 15, 2020 was listed

8  as the date he last physically worked for the employer. When asked why he separated from

9  the employer, RADCLIFFE listed that he was laid off, and listed the reason for the separation

10  as "other reason not listed." RADCLIFFE stated that his gross income was $60,000 and he

11  worked an averaged 60 hours a week.

12        146.    ESD records for Uncle Si's Inc list RADCLIFFE as the president of Uncle Si's

13  Inc. ESD sent Uncle Si's Inc. a letter dated May 28, 2019, notifying Uncle Si's Inc. that they

14  failed to file tax reports with ESD for the period of April 1, 2018, to December 31, 2018. In

15  the comment screen for the Uncle Si's Inc. account, ESD noted on January 6, 2020, that

16  RADCLIFFE "Owner," called in and stated he ".... sold business in December [2019] and

17  doesn't have the time to find actual wages for q4/2019..."

18        147.    On May 13, 2020, ESD sent a letter addressed to Uncle Si's Inc. regarding

19  RADCLIFFE's unemployment benefits. The letter stated that RADCLIFFE reported that he

20  started working for Uncle Si's Inc. on March 1, 2012, last physically worked for Uncle Si's

21  Inc. on March 15, 2020, separated from the job March 15, 2020, and separated due to being

22  laid off.

23        148.    The ESD letter asked Uncle Si's Inc. if they wanted to request RADCLIFFE be

24  put on standby, which would mean RADCLIFFE would not need to look for work but must

25  be available for work during the standby period when needed. Standby may be requested if

26  the claimant regularly works full-time and has an expected return-to-work date for full-time

27  work within eight weeks. The letter that was returned to ESD had the box checked "yes" to

28  put RADCLIFFE on standby, with a standby start date of March 15, 2020, and an expected

Affidavit of SA Matthew McCormick
USAO#2021R01338 – 41

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  return to work date of unknown. The signature at the end of the letter resembled Paul

2  WEDEBERG's name and was dated May 22, 2020. The signature purporting to be

3  WEDEBERG's has not been analyzed by a handwriting expert but may be a forged signature,

4  as it does not resemble other WEDEBERG signatures I have reviewed during this

5  investigation.

6      149.    RADCLIFFE received PUA benefits through regular wire transfers to his

7  KeyBank account -8571, beginning on June 5, 2020, and continuing through September 13,

8  2021. In total, RADCLIFFE received approximately $35,965 in PUA benefits.

9      150.    Part of the requirement for receiving PUA benefits was to show that the

10  employee was actively seeking employment. This included filling out a job search log with

11  names, dates, and locations. RADCLIFFE submitted a job search log for August 15, 2021 to

12  August 21, 2021, which stated that he applied to Vino Bella [a wine bar located in Issaquah,

13  WA] for the position of a chef. RADCLIFFE states on the document that he applied on

14  August 18, 2021, in person. On the **RADCLIFFE Target Facebook Account**, RADCLIFFE

15  posted a life event on August 1, 2021, stating that he moved to Carolina Beach, North

16  Carolina. On August 21, 2021, RADCLIFFE posted on the **RADCLIFFE Target Facebook**

17  **Account**: "Sitting at the beach bar in North Carolina. And watching the Boeing Classic and

18  Eastlake LL. In the World Series. It like I never left [sic]."

19      **G.    Summary of Investigation**

20      151.    Beginning no earlier than March 9, 2019, and continuing through approximately

21  December 31, 2021, RADCLIFFE was engaged in several different schemes to defraud that

22  involved Sandra Brown, Sandra Brown's spouse, and COVID-19 pandemic assistance.

23  RADCLIFFE's schemes likely involved communication and coordination with others,

24  including his friend and business partner, Paul WEDEBERG, who acted as Sandra Brown's

25  Power of Attorney, submitted a fraudulent PPP loan application for RADCLIFFE's benefit,

26  and whose signature appears to be used to verify RADCLIFFE's employment on his

27  fraudulent PUA application.

28

Affidavit of SA Matthew McCormick
USAO#2021R01338 – 42

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    152.    Records obtained from **RADCLIFFE's Target Email** and **WEDEBERG's**

2 **Target Email** shows that RADCLIFFE and WEDEBERG emailed one another extensively

3 while they were engaged in these schemes to defraud.

4    153.    Publicly available posts on **RADCLIFFE's Target Facebook Account** contain

5 evidence of RADCLIFFE's financial activities and state of mind during these schemes.

6 Further, some of his posts appear to contradict claims and representations he made during the

7 time period under investigation, such as statements he made about not using Sandra's funds

8 or property for his own benefit, statements he and WEDEBERG made about Sandra not

9 having enough money to pay for companion care and supplies, and statements he and

10 WEDEBERG made to obtain PPP loan funds and PUA employment benefits.

11    154.    For the foregoing reasons, there is probable cause to believe that

12 **RADCLIFFE's Target Email**, **WEDEBERG's Target Email**, and **RADCLIFFE's Target**

13 **Facebook Account** contain evidence relevant to the Subject Offenses, including

14 conspiratorial communications in furtherance of their schemes to defraud, evidence related to

15 attempts to conceal the source and nature of fraud proceeds, and statements, photographs and

16 location information establishing that RADCLIFFE and WEDEBERG used false or

17 fraudulent pretenses, representations or promises in furtherance of their various schemes.

18            **BACKGROUND REGARDING META AND FACEBOOK SERVICES**

19    155.    Meta owns and operates Facebook, a free-access social networking website that

20 can be accessed at http://www.facebook.com. Facebook users can use their accounts to share

21 communications, news, photographs, videos, and other information with other Facebook

22 users, and sometimes with the general public.

23    156.    Meta asks Facebook users to provide basic contact and personal identifying

24 information either during the registration process or thereafter. This information may include

25 the user's full name, birth date, gender, e-mail addresses, physical address (including city,

26 state, and zip code), telephone numbers, screen names, websites, and other personal

27 identifiers. Each Facebook user is assigned a user identification number and can choose a

28 username.

Affidavit of SA Matthew McCormick
USAO#2021R01338 – 43

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

157.    Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

158.    Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

159.    Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

Affidavit of SA Matthew McCormick
USAO#2021R01338 – 44

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

160.    Facebook users can upload photos and videos to be posted on their Wall, included in chats, or for other purposes. Users can "tag" other users in a photo or video and can be tagged by others. When a user is tagged in a photo or video, he or she generally receives a notification of the tag and a link to see the photo or video.

161.    Facebook users can use Facebook Messenger to communicate with other users via text, voice, video. Meta retains instant messages and certain other shared Messenger content unless deleted by the user, and also retains transactional records related to voice and video chats. of the date of each call. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.

162.    If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

163.    Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

164.    Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

165.    Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

166.    Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

Affidavit of SA Matthew McCormick
USAO#2021R01338 – 45

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

167.    In addition to the applications described above, Meta provides users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

168.    Meta also retains records of which IP addresses were used by an account to log into or out of Facebook, as well as IP address used to take certain actions on the platform. For example, when a user uploads a photo, the user's IP address is retained by Meta along with a timestamp.

169.    Meta retains location information associated with Facebook users under some circumstances, such as if a user enables "Location History," "checks-in" to an event, or tags a post with a location.

170.    Social networking providers like Meta typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Meta about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Meta typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

171.    As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Meta, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a

Affidavit of SA Matthew McCormick
USAO#2021R01338 – 46

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Meta logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, location information retained by Meta may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

172.     Therefore, the servers of Meta are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## BACKGROUND REGARDING EMAIL SERVICES

173.     Microsoft and Comcast are internet service providers that offers a variety of online services including e-mail accounts.

174.     In my training and experience E-mail providers like Microsoft and Comcast typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service

Affidavit of SA Matthew McCormick
USAO#2021R01338 – 47

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via a website), and other log files that reflect usage of the account. In addition, e-mail providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the e-mail account, which can help establish the individual or individuals who had dominion and control over the account and their whereabouts.

175.    In general, an e-mail that is sent to a Microsoft or Comcast subscriber is stored in the subscriber's "mailbox" on the provider's servers until the subscriber deletes the e-mail. If the subscriber does not delete the message, the message can remain on the provider's servers indefinitely. Even if the subscriber deletes the e-mail, it may continue to be available on provider's servers for a certain period of time.

176.    When the subscriber sends an e-mail, it is initiated at the user's computer, transferred via the Internet to the provider's servers, and then transmitted to its end destination. The provider often maintains a copy of the e-mail sent. Unless the sender of the e-mail specifically deletes the e-mail from the provider's server, the e-mail can remain on the system indefinitely. Even if the sender deletes the e-mail, it may continue to be available on Microsoft's servers for a certain period of time.

177.    A sent or received e-mail typically includes the content of the message, source and destination addresses, the date and time at which the e-mail was sent, and the size and length of the e-mail. If an e-mail user writes a draft message but does not send it, that message may also be saved by the provider but may not include all of these categories of data.

**FILTER PROTOCOLS**

178.    RADCLIFFE and WEDEBERG are currently represented by counsel, and, in a law enforcement interview, RADCLIFFE referenced consulting with an attorney regarding

Affidavit of SA Matthew McCormick
USAO#2021R01338 – 48

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  his and WEDEBERG's relationship with Sandra Brown. Therefore, it is possible that one or
2  more of the **TARGET ACCOUNTS** will contain privileged attorney-client communications.

3      179.    To prevent the disclosure of such information to case agents, investigators, and
4  prosecutors assigned to the investigation ("the prosecution team"), one more agents and
5  Assistant United States Attorneys will be assigned to serve as a taint team to review
6  potentially privileged material found during the execution of the warrant. The members of the
7  taint team have had no prior involvement in the investigation and will have no further role in
8  the investigation or prosecution of this case, unless further privilege issues arise requiring
9  additional review or unless some aspect of the taint team review is litigated in court. The taint
10  team members will not reveal the contents of any document determined to contain potentially
11  privileged material to any other person, except the holder of the privilege and their counsel,
12  absent permission from the privilege holder or otherwise as ordered by the court.

13      180.    The taint team will review the material seized to identify and excise potentially
14  privileged information. If the taint team identifies any communications containing privileged
15  information, the taint team will segregate and maintain the communications for later return to
16  the holder of the privilege. Material segregated as potentially privileged will be sealed by the
17  taint team and not be provided to the prosecution team. The remaining non-privileged
18  material that was seized pursuant to the warrant will be released to the prosecution team. If
19  the prosecution team later finds a communication that may contain privileged information, the
20  prosecution team will immediately place it in an envelope or container identified as
21  containing possibly privileged information. The prosecution team will then provide the
22  envelope or container to the taint team who will take custody of the material for the purpose
23  of determining whether the material is in fact privileged.

24      **INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED**

25      181.    I anticipate executing this warrant under the Electronic Communications
26  Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using
27  the warrant to require the identified Providers to disclose to the government copies of the
28  records and other information (including the content of communications) particularly

Affidavit of SA Matthew McCormick
USAO#2021R01338 – 49

described in Section I of Attachments B-1, B-2, and B-3. Upon receipt of the information described in Section I of Attachments B-1, B-2, and B-3, government-authorized persons will review that information to locate the items described in Section II of Attachments B-1, B-2, and B-3.

182.    Pursuant to Title 18, United States Code, Section 2703(g), this application and affidavit for a search warrant seeks authorization to permit Provider, and its agents and employees, to assist agents in the execution of this warrant. Once issued, the search warrant will be presented to Providers with direction that they identify the account described in Attachments A-1, A-2, and A-3 to this affidavit, as well as other subscriber and log records associated with the accounts, as set forth in Section I of Attachments B-1, B-2, and B-3 to this affidavit.

183.    Following a taint team review excising potentially privileged information, I, and/or other law enforcement personnel will thereafter review the copy of the electronically stored data and identify from among that content those items that come within the items identified in Section II to B-1, B-2, and B-3, for seizure.

184.    Analyzing the data contained in the copy of the specified account may require special technical skills, equipment, and software. It could also be very time-consuming. Searching by keywords, for example, can yield thousands of "hits," each of which must then be reviewed in context by the examiner to determine whether the data is within the scope of the warrant. Merely finding a relevant "hit" does not end the review process. Keywords used originally need to be modified continuously, based on interim results. Certain file formats, moreover, do not lend themselves to keyword searches, as keywords, search text, and many common e-mail, database and spreadsheet applications do not store data as searchable text. The data may be saved, instead, in proprietary non-text format. And, as the volume of storage allotted by service providers increases, the time it takes to properly analyze recovered data increases, as well. Consistent with the foregoing, searching the recovered data for the information subject to seizure pursuant to this warrant may require a range of data analysis techniques and may take weeks or even months. All forensic analysis of the data will employ

Affidavit of SA Matthew McCormick
USAO#2021R01338 – 50

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    only those search protocols and methodologies reasonably designed to identify and seize the

2    items identified in Section II of B-1, B-2, and B-3 to the warrant.

3                                    **CONCLUSION**

4        185.    Based on the foregoing, I request that the Court issue the proposed warrant for

5    the **TARGET ACCOUNTS**, identified in Attachments A-1, A-2, and A-3, to search for and

6    seize fruits, evidence, and instrumentalities of the Subject Offenses, as further described in

7    Attachments B-1, B-2, and B-3.

8

9                                    _____

10                                   MATTHEW MCCORMICK

                                     Special Agent

11                                   Federal Bureau of Investigation

12

13       The above-named agent provided a sworn statement attesting to the truth of

     the foregoing affidavit on this   6th   day of September, 2023.

14

15

16                                   _____

17                                   BRIAN A. TSUCHIDA

18                                   United States Magistrate Judge

19

20

21

22

23

24

25

26

27

28

Affidavit of SA Matthew McCormick                    UNITED STATES ATTORNEY
USAO#2021R01338 – 51                               700 STEWART STREET, SUITE 5200
                                                    SEATTLE, WASHINGTON 98101
                                                         (206) 553-7970

# ATTACHMENT A-1

## Account to be Searched

This warrant applies to information associated with the following Subject Facebook Account:

- **Username Rich.radcliffe2**
- **Id # 100003086382362**
- **www.facebook.com/rich.radcliffe2**

that is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc., a company located at 1601 Willow Road, Menlo Park, California.

Attachment A-1
USAO# 2021R00182 – 1

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

**ATTACHMENT B-1**

**Items to be Seized**

## I.    Information to be disclosed by Meta Platforms, Inc. ("Meta")

To the extent that the information described in Attachment A-1 is within the possession, custody, or control of Meta, regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Meta, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Meta is required to disclose the following information to the government for the user ID listed in Attachment A-1:

   a.   All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers;

   b.   All activity logs for the account and all other documents showing the user's posts and other Facebook activities from April 1, 2019 to December 31, 2021;

   c.   All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them from April 1, 2019 to December 31, 2021, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

   d.   All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

   e.   All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

Attachment B-1
USAO# 2021R00182 – 1

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

f.  All other records and contents of communications and messages made or received by the user from <u>April 1, 2019 to December 31, 2021</u>, including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

g.  All "check ins" and other location information;

h.  All IP logs, including all records of the IP addresses that logged into the account;

i.  All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

j.  All information about the Facebook pages that the account is or was a "fan" of;

k.  All past and present lists of friends created by the account;

l.  All records of Facebook searches performed by the account from <u>April 1, 2019 to December 31, 2021</u>;

m.  All information about the user's access and use of Facebook Marketplace;

n.  The types of service utilized by the user;

o.  The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

p.  All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

q.  All records pertaining to communications between Meta and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

Attachment B-1
USAO# 2021R00182 – 2

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

r. A list of any accounts linked to the Subject Facebook Account by machine cookie.

**Meta is hereby ordered to disclose the above information to the government within 14 days of issuance of this warrant.**

## II.    Information to be seized by the government

For the User ID listed on Attachment A-1, all information described above in Section I that constitutes fruits, evidence and instrumentalities of Mail, Wire, and Bank Fraud, in violation of Title 18, United States Code, Sections 1341, 1343, 1344; Aggravated Identity Theft, in violation of Title 18 U.S.C. Section 1028A; Money Laundering, in violation of Title 18, United States Code, Sections 1956 and 1957, and Conspiracy, in violation of Title 18, United States Code, Sections 371 and 1349 (the Subject Offenses), committed by Richard RADCLIFFE or Paul WEDEBERG, those violations occurring between approximately April 1, 2019 to December 31, 2021, including the following:

a. Records and information related to Sandra Brown or Robert (Carolyn) Brown;

b. Records and information related to RADCLIFFE or WEDEBERG's personal or legal relationship with Sandra Brown;

c. Records and information related to Sandra Brown's living arrangements, health, finances, or property;

d. Records and information related to representations made by RADCLIFFE or WEDEBERG about Sandra Brown, such as representations about the nature of their relationship, her finances, her living arrangements, or her health, whether made directly to Sandra Brown or to others;

e. Records and information related to purported renovations of Sandra Brown's real property, including expenses and reimbursement for such renovations;

f. Communications between RADCLIFFE and WEDEBERG regarding Sandra Brown;

g. Records and information related to RADCLIFFE or WEDEBERG's use or disposition of Sandra Brown's property, including real property and financial accounts;

Attachment B-1
USAO# 2021R00182 – 3

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

h.  Records and information related to the 2020 Paycheck Protection Program (PPP) Loan application on behalf of Radcliffe Restaurant Group;

i.  Communications between RADCLIFFE and WEDEBERG about the 2020 PPP Loan application on behalf of Radcliffe Restaurant Group;

j.  Records and information related to RADCLIFFE's 2020 unemployment claim;

k.  Communications between RADCLIFFE and WEDEBERG about the 2020 unemployment claim;

l.  Records and information related to the business operations of Radcliffe Restaurant Group, Uncle Si's, and related restaurant entities, including sale information, dates of operation, payroll information, and information about the number and type of employees;

m.  Records and information related to a 2021 insurance annuity claim filed with Talcott Insurance on behalf of Robert Brown;

n.  Records and information that are evidence of false or fraudulent pretenses, representations, or promises relating to the Subject Offenses;

o.  Communications in furtherance of the Subject Offenses;

p.  Evidence of the identity of the user(s) of the account;

q.  Evidence of the location or whereabouts, both current and historical, of the user(s) of the account;

r.  Evidence that identifies potential co-conspirators or criminal associates for the Subject Offenses;

s.  Evidence indicating Sandra Brown's, RADCLIFFE's or WEDEBERG's state of mind as it relates to the Subject Offenses;

t.  Records of communications between Meta/Facebook and any person purporting to be the account holder about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users about the specified account. This to include records of contacts between the subscriber and the provider's support services, as well as records of any actions taken by the provider or subscriber as a result of the communications.

Attachment B-1
USAO# 2021R00182 – 4

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

u.    Any complaints and records relating to any adverse action taken on the account, including an account suspension for violations of terms of service, whether temporary or permanent, the details surrounding that adverse action, and any communications related thereto.

v.    Subscriber records for the account including 1) name, email address, and screen names; 2) physical address; 3) records of session times and durations; 4) length of service (including start date) and types of services utilized; 5) telephone or instrument number or other subscriber number or identity, including any temporarily assigned network address such as internet protocol address, media access card addresses, or any other unique device identifiers recorded by Meta in relation to the account; 6) account log files (login IP address, account activation IP address, and IP address history); 7) billing records/logs; 8) means and source of payment; and 9) language settings.

w.    Identification of linked accounts.

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

Attachment B-1
USAO# 2021R00182 – 5

**ATTACHMENT A-2**

**Account to be Searched**

This warrant applies to information associated with **Hotmail Account: Rich37r@hotmail.com** that is stored at premises owned, maintained, controlled, or operated by Microsoft Corporation, a company located at 1 Microsoft Way, Redmond, Washington.

Attachment A-2
USAO# 2021R01338 – 1

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5200
SEATTLE, WASHINGTON 98101
(206) 553-7970

**ATTACHMENT B-2**

**Items to be Seized**

**II.     Information to be disclosed by Microsoft**

To the extent that the information described in Attachment A-2 is within the possession, custody, or control of Microsoft, regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Microsoft, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Microsoft is required to disclose the following information to the government for the user ID listed in Attachment A-2:

    a.   The contents of all e-mails associated with the account from <u>April 1, 2019 to December 31, 2021</u>, including stored or preserved copies of e-mails sent to and from the account, draft e-mails, the source and destination addresses associated with each e-mail, the date and time at which each e-mail was sent, and the size and length of each e-mail;

    b.   All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative e-mail addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

    c.   The types of service utilized;

    d.   All records or other information stored at any time by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files;

    e.   All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken.

**Microsoft is hereby ordered to disclose the above information to the government within 14 days of issuance of this warrant.**

**II.    Information to be seized by the government**

For the Account identified in Attachment A-2, all information described above in Section I that constitutes fruits, evidence and instrumentalities of Mail, Wire, and Bank Fraud, in violation of Title 18, United States Code, Sections 1341, 1343, 1344; Aggravated Identity Theft, in violation of Title 18 U.S.C. Section 1028A; Money Laundering, in violation of Title 18, United States Code, Sections 1956 and 1957, and Conspiracy, in violation of Title 18, United States Code, Sections 371 and 1349 (the Subject Offenses), committed by Richard RADCLIFFE or Paul WEDEBERG, those violations occurring between approximately April 1, 2019 to December 31, 2021, including the following:

    a.    Records and information related to Sandra Brown or Robert (Carolyn) Brown;

    b.    Records and information related to RADCLIFFE or WEDEBERG's personal or legal relationship with Sandra Brown;

    c.    Records and information related to Sandra Brown's living arrangements, health, finances, or property;

    d.    Records and information related to representations made by RADCLIFFE or WEDEBERG about Sandra Brown, such as representations about the nature of their relationship, her finances, her living arrangements, or her health, whether made directly to Sandra Brown or to others;

    e.    Records and information related to purported renovations of Sandra Brown's real property, including expenses and reimbursement for such renovations;

    f.    Communications between RADCLIFFE and WEDEBERG regarding Sandra Brown;

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

g.      Records and information related to RADCLIFFE or WEDEBERG's use or disposition of Sandra Brown's property, including real property and financial accounts;

h.      Records and information related to the 2020 Paycheck Protection Program (PPP) Loan application on behalf of Radcliffe Restaurant Group;

i.      Communications between RADCLIFFE and WEDEBERG about the 2020 PPP Loan application on behalf of Radcliffe Restaurant Group;

j.      Records and information related to RADCLIFFE's 2020 unemployment claim;

k.      Communications between RADCLIFFE and WEDEBERG about the 2020 unemployment claim;

l.      Records and information related to the business operations of Radcliffe Restaurant Group, Uncle Si's, and related restaurant entities, including sale information, dates of operation, payroll information, and information about the number and type of employees;

m.      Records and information related to a 2021 insurance annuity claim filed with Talcott Insurance on behalf of Robert Brown;

n.      Records and information that are evidence of false or fraudulent pretenses, representations, or promises relating to the Subject Offenses;

o.      Communications in furtherance of the Subject Offenses;

p.      Evidence of the identity of the user(s) of the account;

q.      Evidence of the location or whereabouts, both current and historical, of the user(s) of the account;

r.      Evidence that identifies potential co-conspirators or criminal associates for the Subject Offenses;

s.      Evidence indicating Sandra Brown's, RADCLIFFE's or WEDEBERG's as it relates to the Subject Offenses;

t.      Records of communications between Microsoft/Hotmail and any person purporting to be the account holder about issues relating to the account,

Attachment B-2
USAO#2021R01338 – 3

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

such as technical problems, billing inquiries, or complaints from other users about the specified account. This to include records of contacts between the subscriber and the provider's support services, as well as records of any actions taken by the provider or subscriber as a result of the communications.

u.   Any complaints and records relating to any adverse action taken on the account, including an account suspension for violations of terms of service, whether temporary or permanent, the details surrounding that adverse action, and any communications related thereto.

v.   Subscriber records for the account including 1) name, email address, and screen names; 2) physical address; 3) records of session times and durations; 4) length of service (including start date) and types of services utilized; 5) telephone or instrument number or other subscriber number or identity, including any temporarily assigned network address such as internet protocol address, media access card addresses, or any other unique device identifiers recorded by Microsoft/Hotmail in relation to the account; 6) account log files (login IP address, account activation IP address, and IP address history); 7) billing records/logs; 8) means and source of payment; and 9) language settings.

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

Attachment B-2
USAO#2021R01338 – 4

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## ATTACHMENT A-3

### Account to be Searched

This warrant applies to information associated with **Comcast Account: paul.wedeberg@comcast.net** that is stored at premises owned, maintained, controlled, or operated by Comcast Communications LLC, a company located at 1800 Bishops Gate Boulevard, Mount Laurel, New Jersey.

Attachment A-3
USAO#2021R01338 – 1

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**ATTACHMENT B-3**

**Items to be Seized**

**I.    Information to be disclosed by Comcast.**

To the extent that the information described in Attachment A-3 is within the possession, custody, or control of Comcast, regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Comcast, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Comcast is required to disclose the following information to the government for the user ID listed in Attachment A-3:

a.  The contents of all e-mails associated with the account from April 1, 2019 to December 31, 2021, including stored or preserved copies of e-mails sent to and from the account, draft e-mails, the source and destination addresses associated with each e-mail, the date and time at which each e-mail was sent, and the size and length of each e-mail;

b.  All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative e-mail addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

c.  The types of service utilized;

d.  All records or other information stored at any time by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files;

e.  All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken.

Attachment B-3
USAO#2021R01338 – 1

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**Comcast is hereby ordered to disclose the above information to the government within 14 days of issuance of this warrant.**

## II.    Information to be seized by the government.

For the Account identified in Attachment A-3, all information described above in Section I that constitutes fruits, evidence and instrumentalities of Mail, Wire, and Bank Fraud, in violation of Title 18, United States Code, Sections 1341, 1343, 1344; Aggravated Identity Theft, in violation of Title 18 U.S.C. Section 1028A; Money Laundering, in violation of Title 18, United States Code, Sections 1956 and 1957, and Conspiracy, in violation of Title 18, United States Code, Sections 371 and 1349 (the Subject Offenses), committed by Richard RADCLIFFE or Paul WEDEBERG, those violations occurring between approximately April 1, 2019 to December 31, 2021, including the following:

a.    Records and information related to Sandra Brown or Robert (Carolyn) Brown;

b.    Records and information related to RADCLIFFE or WEDEBERG's personal or legal relationship with Sandra Brown;

c.    Records and information related to Sandra Brown's living arrangements, health, finances, or property;

d.    Records and information related to representations made by RADCLIFFE or WEDEBERG about Sandra Brown, such as representations about the nature of their relationship, her finances, her living arrangements, or her health, whether made directly to Sandra Brown or to others;

e.    Records and information related to purported renovations of Sandra Brown's real property, including expenses and reimbursement for such renovations;

f.    Communications between RADCLIFFE and WEDEBERG regarding Sandra Brown;

Attachment B-3
USAO#2021R01338 – 2

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

g.  Records and information related to RADCLIFFE or WEDEBERG's use or disposition of Sandra Brown's property, including real property and financial accounts;

h.  Records and information related to the 2020 Paycheck Protection Program (PPP) Loan application on behalf of Radcliffe Restaurant Group;

i.  Communications between RADCLIFFE and WEDEBERG about the 2020 PPP Loan application on behalf of Radcliffe Restaurant Group;

j.  Records and information related to RADCLIFFE's 2020 unemployment claim;

k.  Communications between RADCLIFFE and WEDEBERG about the 2020 unemployment claim;

l.  Records and information related to the business operations of Radcliffe Restaurant Group, Uncle Si's, and related restaurant entities, including sale information, dates of operation, payroll information, and information about the number and type of employees;

m.  Records and information related to a 2021 insurance annuity claim filed with Talcott Insurance on behalf of Robert Brown;

n.  Records and information that are evidence of false or fraudulent pretenses, representations, or promises relating to the Subject Offenses;

o.  Communications in furtherance of the Subject Offenses;

p.  Evidence of the identity of the user(s) of the account;

q.  Evidence of the location or whereabouts, both current and historical, of the user(s) of the account;

r.  Evidence that identifies potential co-conspirators or criminal associates for the Subject Offenses;

s.  Evidence indicating Sandra Brown's, RADCLIFFE's or WEDEBERG's state of mind as it relates to the Subject Offenses;

t.  Records of communications between Microsoft/Hotmail and any person purporting to be the account holder about issues relating to the account,

Attachment B-3
USAO#2021R01338 – 3

such as technical problems, billing inquiries, or complaints from other users about the specified account. This to include records of contacts between the subscriber and the provider's support services, as well as records of any actions taken by the provider or subscriber as a result of the communications.

u.   Any complaints and records relating to any adverse action taken on the account, including an account suspension for violations of terms of service, whether temporary or permanent, the details surrounding that adverse action, and any communications related thereto.

v.   Subscriber records for the account including 1) name, email address, and screen names; 2) physical address; 3) records of session times and durations; 4) length of service (including start date) and types of services utilized; 5) telephone or instrument number or other subscriber number or identity, including any temporarily assigned network address such as internet protocol address, media access card addresses, or any other unique device identifiers recorded by Comcast in relation to the account; 6) account log files (login IP address, account activation IP address, and IP address history); 7) billing records/logs; 8) means and source of payment; and 9) language settings.

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

Attachment B-3
USAO#2021R01338 – 4

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970